# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## RAFAELI, LLC v OAKLAND COUNTY

Docket No. 156849. Argued November 7, 2019 (Calendar No. 1). Decided July 17, 2020.

Rafaeli, LLC, and Andre Ohanessian brought an action in the Oakland Circuit Court against Oakland County and its treasurer, Andrew Meisner, alleging due-process and equal-protection violations as well as an unconstitutional taking of their properties. Rafaeli owed $8.41 in unpaid property taxes from 2011, which grew to $285.81 after interest, penalties, and fees. Defendants foreclosed on Rafaeli's property for the delinquency, sold the property at public auction for $24,500, and retained all the sale proceeds in excess of the taxes, interest, penalties, and fees. Ohanessian owed approximately $6,000 in unpaid taxes, interest, penalties, and fees from 2011. Like Rafaeli's property, defendants foreclosed on Ohanessian's property for the delinquency, sold his property at auction for $82,000, and retained all the proceeds in excess of Ohanessian's tax debt. Plaintiffs specifically alleged that defendants, by selling plaintiffs' real properties in satisfaction of their tax debts and retaining the surplus proceeds from the tax-foreclosure sale of their properties, had taken their properties without just compensation in violation of the Takings Clauses of the United States and Michigan Constitutions. The circuit court, Denise K. Langford-Morris, J., granted summary disposition to defendants, finding that defendants did not "take" plaintiffs' properties because plaintiffs forfeited all interests they held in their properties when they failed to pay the taxes due on the properties. The court determined that property properly forfeited under the General Property Tax Act (GPTA), MCL 211.1 *et seq.*, and in accordance with due process is not a "taking" barred by either the United States or Michigan Constitution. Because the GPTA properly divested plaintiffs of all interests they had in their properties, the court concluded that plaintiffs did not have a property interest in the surplus proceeds generated from the tax-foreclosure sale of their properties. Plaintiffs appealed in the Court of Appeals. In an unpublished per curiam opinion issued on October 24, 2017 (Docket No. 330696), the Court of Appeals, MARKEY, P.J., and METER and SHAPIRO, JJ., affirmed the circuit court's decision and rejected plaintiffs' argument that the GPTA's "scheme" allows for unconstitutional takings. Drawing on *Bennis v Michigan*, 516 US 442 (1996), a United States Supreme Court case regarding civil-asset forfeiture resulting from criminal activity, the Court of Appeals held that defendants acquired their interest in plaintiffs' properties by way of a statutory scheme that did not violate due process and thus that defendants were not required to compensate plaintiffs for property that was lawfully obtained. Plaintiffs sought leave to appeal in the Supreme Court, raising the takings issue as the sole issue on appeal. The Supreme Court granted the application. 503 Mich 909 (2018).

In an opinion by Justice ZAHRA, joined by Chief Justice MCCORMACK and Justices MARKMAN, BERNSTEIN, CLEMENT, and CAVANAGH, the Supreme Court *held*:

Michigan's common law recognizes a former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property, and this right is vested such that it is to remain free from unlawful governmental interference. Accordingly, when the government takes property to satisfy an unpaid tax debt, Michigan's Takings Clause requires the foreclosing governmental unit to return any proceeds from the tax-foreclosure sale in excess of the delinquent taxes, interest, penalties, and fees reasonably related to the foreclosure and sale of the property as just compensation. To the extent the GPTA permits the government to retain these surplus proceeds and transfer them into the county general fund, the GPTA is unconstitutional as applied to former property owners whose properties were sold at a tax-foreclosure sale for more than the amount owed in unpaid taxes, interest, penalties, and fees related to the forfeiture, foreclosure, and sale of their properties. The trial court's reliance on the term "forfeiture" in the GPTA was incorrect, and the Court of Appeals erred by relying on *Bennis* to conclude that no taking occurred in this case.

1. The trial court's reliance on the term "forfeiture" in the GPTA was incorrect. Under MCL 211.78(8)(b), "forfeiture" simply permits defendants to seek a judgment of foreclosure. Forfeiture does not affect title, nor does it give the county treasurer (or the state if the state is the foreclosing governmental unit) any rights, titles, or interests to the forfeited property. Therefore, plaintiffs did not "forfeit" all rights, titles, and interests they had in their properties by failing to pay their real-property taxes.

2. The Court of Appeals erred by relying on *Bennis* to conclude that no taking occurred in this case. *Bennis* is distinguishable because the purpose of civil-asset forfeiture is different than the purpose of the GPTA provisions at issue in this case. *Bennis* recognized that civil-asset forfeiture serves, at least in part, to punish the owner of property, but the GPTA is not punitive in nature; its aim is to encourage the timely payment of property taxes and to return tax-delinquent properties to their tax-generating status, not necessarily to punish property owners for failing to pay their property taxes. The Court's holding in *Bennis* focused narrowly on forfeited property that was used as an instrumentality for criminal activity and the government's interest in deterring illegal activity. In this case, plaintiffs did not use their properties for illicit purposes. They simply failed to pay their property taxes, which is not a criminal offense. Accordingly, the Court of Appeals improperly conflated the meaning of "forfeiture" in an unrelated area of law with the meaning of "forfeiture" as expressly described under the GPTA.

3. A claim of an unconstitutional taking is distinct from a claim of property deprivation without due process of law. The remedy for a taking of private property is just compensation, whereas the remedy for being deprived of property without due process of law is the return of the property. In this case, plaintiffs did not dispute the legitimacy of defendants' authority to foreclose on their properties, nor did plaintiffs contest the adequacy of defendants' efforts to notify plaintiffs of the tax delinquency, forfeiture, and foreclosure; instead, plaintiffs challenged defendants' retention of the surplus proceeds as an unconstitutional taking. Plaintiffs' request for a determination of just compensation demonstrated that the nature of their claim was a taking without just compensation, not a deprivation of property without due process of law. Therefore,

there was no legal basis to conclude that defendants' compliance with the GPTA's notice provisions justified defendants' retention of the surplus proceeds.

4. Under US Const, Am V and Const 1963, art 10, § 2, private property shall not be taken for public use without just compensation. Michigan's Takings Clause has been interpreted to afford property owners greater protection than its federal counterpart when it comes to the state's ability to take private property for a public use under the power of eminent domain. A "taking" for purposes of inverse condemnation means that the government has permanently deprived the property owner of any possession or use of the property without the commencement of formalized condemnation proceedings. When such a taking occurs, the property owner is entitled to just compensation for the value of the property taken. In order to assert a takings claim of this nature, a claimant must first establish a vested property right under state law. In this case, plaintiffs alleged that they have a cognizable, vested property right to the surplus proceeds that resulted from the tax-foreclosure sale of their properties under Michigan law that is protected by Michigan's Takings Clause. The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification. The whole of Article 10, § 2 has a technical meaning that must be discerned by examining the purpose and history of the power of eminent domain. *People ex rel Seaman v Hammond*, 1 Doug 276 (Mich, 1844), *United States v Lawton*, 110 US 146 (1884), and *Nelson v City of New York*, 352 US 103 (1956), all address a former property owner's statutory right to recover the surplus proceeds. *Seaman* recognized that the owner or claimant of the land at the time of the tax-foreclosure sale had a statutory right to recover the surplus. Consistent with *Seaman*, *Lawton* not only recognized this statutory right but also made it clear that a Takings Clause violation will arise when a tax-sale statute grants a former owner an independent property interest in the surplus proceeds and the government fails to return that surplus. *Nelson*, on the other hand, held that no federal Takings Clause claim will exist when there is a statutory path to recover the surplus proceeds but the property owners fail to avail themselves of that procedure. Read together, *Lawton* and *Nelson* establish that the Takings Clause under the United States Constitution may afford former property owners a remedy when a tax-sale statute provides the divested property owner an interest in the surplus proceeds and the government does not honor that statutory interest. However, *Seaman*, *Lawton*, and *Nelson* do not provide direction on what occurs when the statutes governing foreclosure make no mention of, or expressly preclude, a divested property owner's right to the surplus proceeds but the divested property owner establishes a property right to the surplus proceeds through some other legal source, such as the common law. In that instance, the failure to provide the divested property owner an avenue for recovering the surplus proceeds would produce an identical result to *Lawton*: property to which an individual is legally entitled has been taken without recourse. Michigan's statutory scheme under the GPTA does not recognize a former property owner's statutory right to collect these surplus proceeds; therefore, it had to be determined whether plaintiffs have a vested property right to these surplus proceeds through some other legal source, such as the common law.

5. Michigan's common law is adopted from England; therefore, English cases and authorities may be considered when identifying common law. A review of English common law supported the notion that an owner of real or personal property has a right to any surplus proceeds that remain after the property is sold to satisfy a tax debt. The Magna Carta protected property owners from uncompensated takings and recognized that tax collectors could only seize property to satisfy the value of the debt payable to the Crown, leaving the property owner with the excess.

Sir William Blackstone similarly explained in the context of bailments that whenever the government seized property for delinquent taxes, it did so subject to an implied contract in law to either return the property if the tax debt was paid or to render back the surplus if the property was sold to satisfy the delinquent taxes. The right to collect the surplus proceeds was also firmly established in the early years of Michigan's statehood, and throughout Michigan's history the Michigan Supreme Court has held that the government's takings power is limited to only that property which is necessary to serve the public. These fundamental principles—that the government shall not collect more taxes than are owed, nor shall it take more property than is necessary to serve the public—protect taxpayers and property owners alike from government overreach and have remained a staple in Michigan's jurisprudence. A property owner's right to collect the surplus proceeds from the tax-foreclosure sale of his or her property has also withstood the most recent ratification of the Michigan Constitution, as exemplified by *Dean v Dep't of Natural Resources*, 399 Mich 84 (1976), which recognized a right to collect those proceeds under the common-law claim of unjust enrichment. *Dean* stands for more than just a recognition of the plaintiff's right to bring a claim under unjust enrichment for the surplus proceeds; inherent in *Dean*'s holding is Michigan's protection under the common law of a property owner's right to collect the surplus proceeds that result from a tax-foreclosure sale. Accordingly, Michigan's common law recognizes a former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property, and this right is vested such that it is to remain free from unlawful governmental interference.

6. The amendments of the GPTA did not abrogate the common-law right to collect the surplus proceeds. The 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. While the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause.

7. As the foreclosing governmental unit under the GPTA, defendants were entitled to seize plaintiffs' properties to satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of plaintiffs' properties. But defendants could only collect the amount plaintiffs owed and nothing more. Once defendants foreclosed on plaintiffs' properties, obtained title to those properties, and sold them to satisfy plaintiffs' unpaid taxes, interest, penalties, and fees related to the foreclosures, any surplus resulting from those sales belonged to plaintiffs. Defendants' retention of those surplus proceeds under the GPTA amounted to a taking of a vested property right requiring just compensation. To the extent the GPTA permits defendants to retain these surplus proceeds and transfer them into the county general fund, the GPTA is unconstitutional as applied to former property owners whose properties were sold at a tax-foreclosure sale for more than the amount owed in unpaid taxes, interest, penalties, and fees related to the forfeiture, foreclosure, and sale of their properties. Defendants were required to return the surplus proceeds to plaintiffs, and defendants' failure to do so constituted a government taking under the Michigan Constitution entitling plaintiffs to just compensation.

8. The remedy for a government taking is just compensation for the value of the property taken. The property "taken" is the surplus proceeds from the tax-foreclosure sale of plaintiffs' properties to satisfy their tax debts. Therefore, plaintiffs are entitled to the value of those surplus proceeds as just compensation.

Reversed and remanded to the Oakland Circuit Court for further proceedings.

Justice VIVIANO, concurring, agreed with the majority's result but disagreed with much of its reasoning. Justice VIVIANO would interpret the Constitution by discerning the ordinary meaning of the term "property" and applying it to the facts of this case, concluding that the property right taken from plaintiffs was their equity in their respective properties and not any independent interest in the surplus proceeds from the tax-foreclosure sale. The majority did not explain which words in the Takings Clause were in need of interpretation, and the majority's investigation of what the ratifiers understood property to mean ultimately rested on a flawed understanding of its original meaning. By reasoning that "property" must be defined as the particular types the ratifiers had in mind, the majority interpreted the Takings Clause as exalting those interests above the Legislature's authority to modify them, raising serious concerns regarding the separation of powers. Under the majority's position, any property rights extant when the Constitution was ratified would be insulated from legislative change, whereas later-developed property rights would presumably be subject to change. The majority's broad position would not allow the Legislature to repeal rights that were recognized property rights at the time of ratification and thereby preserved in the Takings Clause, and this prohibition would extend even to legislation that prospectively modified or abrogated nonvested property rights—i.e., rights to property that individuals might acquire in the future. Furthermore, the majority characterized the property at issue as merely the surplus proceeds from the foreclosure sale but did not consider the property interests that existed before the sale or how those interests affected the taxpayer's entitlement to anything resulting from the sale. And it was far from clear what implications the former existence of a statutory right to surplus proceeds had in determining the application of the constitutional right in this case. In sum, Justice VIVIANO would have characterized the property right at issue in this case as the taxpayer's equity in the property, which best fits the development of ownership rights in property laden with debts and liens. The Legislature did not purport to abrogate the taxpayer's equity; therefore, a taking occurred when title to plaintiffs' property was vested in the government without any possibility of redemption, and plaintiffs were owed the surplus proceeds from the tax-foreclosure sales.

©2020 State of Michigan

# OPINION

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 17, 2020

STATE OF MICHIGAN

SUPREME COURT

RAFAELI, LLC, and ANDRE
OHANESSIAN,

        Plaintiffs-Appellants,

v                                        No. 156849

OAKLAND COUNTY and ANDREW
MEISNER,

        Defendants-Appellees.

BEFORE THE ENTIRE BENCH

ZAHRA, J.

Plaintiff Rafaeli, LLC, owed $8.41 in unpaid property taxes from 2011, which grew to $285.81 after interest, penalties, and fees. Oakland County and its treasurer, Andrew Meisner (collectively, defendants), foreclosed on Rafaeli's property for the delinquency, sold the property at public auction for $24,500, and retained all the sale proceeds in excess of the taxes, interest, penalties, and fees. Plaintiff Andre Ohanessian owed approximately $6,000 in unpaid taxes, interest, penalties, and fees from 2011. Like Rafaeli's property,

defendants foreclosed on Ohanessian's property for the delinquency, sold his property at auction for $82,000, and retained all the proceeds in excess of Ohanessian's tax debt. The issue in this case is whether defendants have committed an unconstitutional taking by retaining the surplus proceeds from the tax-foreclosure sale of Rafaeli's and Ohanessian's (collectively, plaintiffs) properties that exceed the amount plaintiffs owed in unpaid delinquent taxes, interest, penalties, and fees under the General Property Tax Act (GPTA).[1] We hold that defendants' retention of those surplus proceeds is an unconstitutional taking without just compensation under Article 10, § 2 of our 1963 Constitution. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the Oakland Circuit Court for proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

Rafaeli purchased a rental property in Southfield for $60,000 on August 15, 2011, but failed to pay the 2011 taxes due on the property in the amount of $536.24.[2] Defendants mailed to Rafaeli notice of the delinquency on June 11, 2012. Rafaeli sent payment to defendants on August 30, 2012, yet this payment was insufficient to cover the full amount of the tax delinquency. Defendants mailed a second notice of the delinquency to Rafaeli on September 3, 2012, and Rafaeli sent another payment to defendants on January 14, 2013; however, even after Rafaeli's second payment, a deficiency of $8.41, plus $2.26 in

---

[1] MCL 211.1 *et seq.*

[2] In plaintiffs' complaint, Rafaeli alleges that a tax deficiency remained on the property despite certification from Meisner that all taxes were paid on the property from the previous five years. This led to a tax delinquency of $496.52 plus $39.72 in penalties, fees, and interest.

interest, penalties, and fees remained on Rafaeli's property. On February 1, 2013, defendants sent Rafaeli a third notice of delinquency. This delinquency was never paid, and as a result, on March 1, 2013, Rafaeli's property was forfeited in the amount of the unpaid taxes, interest, penalties, and fees.

On May 16, 2013, defendants filed a petition seeking to foreclose all tax-delinquent properties that were forfeited for unpaid 2011 real-property taxes, including Rafaeli's property. On February 26, 2014, a foreclosure hearing was held in the Oakland Circuit Court. Rafaeli did not appear. After the hearing, the court entered a judgment of foreclosure that included Rafaeli's property. At the time of the foreclosure, the delinquency had grown to $285.81 because of penalties, interest, and fees. Rafaeli failed to timely redeem the property by March 31, 2014, resulting in the transfer to defendants of fee simple title to Rafaeli's property. On August 19, 2014, defendants sold Rafaeli's property at auction to a third party for $24,500. Defendants retained all the surplus proceeds that exceeded the $285.81 debt Rafaeli owed to defendants.

Ohanessian purchased a 2.7-acre property located in the city of Orchard Lake Village in 2004. Ohanessian paid $2,510.05 to defendants to satisfy his 2010 delinquent property taxes but failed to pay his 2011 property taxes.[3] After Ohanessian's property was forfeited for the amount of the unpaid taxes, interest, penalties, and fees, defendants added

---

[3] According to Ohanessian, he moved to California sometime in 2011. He alleges that he filled out an electronic change-of-address form on defendants' website but that he stopped receiving his tax bills when he moved. He states that he used a mailbox at a UPS store in Eastpointe to receive his property-tax bills. Defendants claim that they used this address, as well as Ohanessian's former residence in Livonia, to send Ohanessian notice of the tax delinquency in June 2013, December 2013, and February 2014. Defendants claim that they received no response to these notices.

3

his property to the petition for foreclosure for unpaid 2011 real-property taxes. The same judgment of foreclosure entered on February 26, 2014, that included Rafaeli's property also included Ohanessian's property. At the time of the foreclosure, Ohanessian owed approximately $6,000 in unpaid taxes, interest, penalties, and fees. Ohanessian failed to redeem his property by March 31, 2014, and defendants obtained fee simple title to his property. On September 26, 2014, defendants sold Ohanessian's property at auction to a third party for $82,000. Defendants retained all the surplus proceeds exceeding Ohanessian's tax debts.

Plaintiffs filed this action against defendants in the Oakland Circuit Court, alleging due-process and equal-protection violations as well as an unconstitutional taking.[4] As relevant to this case, plaintiffs specifically alleged that defendants, by selling plaintiffs' real properties in satisfaction of their tax debts and retaining the surplus proceeds from the tax-foreclosure sale of their properties, had taken their properties without just compensation in violation of the Takings Clauses of the United States and Michigan Constitutions.

The circuit court granted summary disposition to defendants, finding that defendants did not "take" plaintiffs' properties because plaintiffs forfeited all interests they held in

---

[4] Prior to filing this action, Rafaeli and a nonparty to this case filed a putative class action against the counties of Wayne and Oakland in federal court, asserting, among other things, an unconstitutional-takings claim. The case was dismissed for lack of subject-matter jurisdiction. *Rafaeli, LLC v Wayne Co*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued June 4, 2015 (Case No. 14-13958).

their properties when they failed to pay the taxes due on the properties.[5] The court

determined that property properly forfeited under the GPTA and in accordance with due

process is not a "taking" barred by either the United States or Michigan Constitution.

Because the GPTA properly divested plaintiffs of all interests they had in their properties,

the court concluded that plaintiffs did not have a property interest in the surplus proceeds

generated from the tax-foreclosure sale of their properties.[6] Plaintiffs appealed in the Court

of Appeals. The Court of Appeals affirmed the circuit court and rejected plaintiffs'

argument that the GPTA's "scheme" allows for unconstitutional takings.[7] Drawing on

precedent from the United States Supreme Court regarding civil-asset forfeiture resulting

from criminal activity, the Court of Appeals held that defendants acquired their interest in

plaintiffs' properties "by way of a statutory scheme that did not violate due process" and

thus defendants were not required to compensate plaintiffs for property that was lawfully

obtained.[8]

---

[5] *Rafaeli, LLC v Oakland Co*, unpublished opinion and order of the Oakland Circuit Court, issued October 8, 2015 (Docket No. 15-147429-CZ), p 3.

[6] Plaintiffs moved for reconsideration and also moved to amend their complaint to add claims of substantive due-process violations, violations of the Eighth Amendment's prohibition against excessive fines, and unjust enrichment. The circuit court denied reconsideration and denied plaintiffs' proposed amendment as futile.

[7] *Rafaeli, LLC v Oakland Co*, unpublished per curiam opinion of the Court of Appeals, issued October 24, 2017 (Docket No. 330696), p 5.

[8] *Id*., citing *Bennis v Michigan*, 516 US 442, 452; 116 S Ct 994; 134 L Ed 2d 68 (1996). Judge SHAPIRO concurred with the majority's conclusion that plaintiffs failed to state a compensable takings claim but disagreed with the majority's reliance on principles of civil-asset forfeiture. Instead, Judge SHAPIRO relied on different authority from the United States Supreme Court, which he concluded had rejected a similar claim to recover the surplus proceeds from a tax-foreclosure sale. *Rafaeli* (SHAPIRO, J., concurring), unpub op

5

Plaintiffs sought leave to appeal in this Court, raising the takings issue as the sole issue on appeal. We granted plaintiffs' application, ordering the parties to address whether defendants violated the Takings Clause of the United States Constitution, the Michigan Constitution, or both by retaining the proceeds from the sale of tax-foreclosed property that exceeded the amount of the taxes, penalties, interest, and fees owed on the property.[9]

## II. OVERVIEW OF THE GPTA

The GPTA permits the recovery of unpaid real-property taxes, penalties, interest, and fees through the foreclosure and sale of the property on which there is a tax delinquency. Under the current process, tax-delinquent properties are forfeited to the county treasurers; foreclosed on after a judicial foreclosure hearing; and, if not timely

---

at 1-2, citing *Nelson v City of New York*, 352 US 103, 111; 77 S Ct 195; 1 L Ed 2d 171 (1956).

[9] *Rafaeli, LLC v Oakland Co*, 503 Mich 909 (2018).

6

redeemed, sold at a public auction.[10]  Counties may elect to serve as the "foreclosing

governmental unit"; otherwise, the state will do so.[11]

Real-property taxes are assessed and collected first by the city, township, or village

treasurer where the property is located.[12]  When property taxes are not satisfied and become

---

[10] Before 1999, delinquent-tax liens were offered at annual tax-lien sales in which anyone could purchase the tax liens.  See Smith, *Foreclosure of Real Property Tax Liens Under Michigan's New Foreclosure Process*, 29 Mich Real Prop Rev 51, 51 (2002); see also Alexander, *Tax Liens, Tax Sales, and Due Process*, 75 Ind L J 747, 760 (2000) ("This transfer of the lien is distinct from the sale of the underlying property which occurs at a tax foreclosure sale.  Instead, what is transferred is the lien itself, vesting in the purchaser the right to enforce the lien in accordance with statutory procedures.").  The tax-lien sale was followed by a one-year redemption period.  If the property was not timely redeemed, the tax-lien purchaser, or the state if there was no tax-lien purchaser, would be deeded the property and was responsible for the final foreclosure of the property.  The former foreclosure process could extend many years, causing properties to deteriorate and become clouded with poor title, which often led to title-insurance companies refusing to insure these properties.  As a result, the Legislature overhauled the GPTA in 1999.  See 1999 PA 123.  The current scheme expedites the foreclosure process, thereby reducing the amount of abandoned, tax-delinquent properties within the state.  Given that the sole issue in this appeal is whether a "taking" occurred, many of the GPTA's procedures regarding the notice and hearing requirements, which are relevant to due-process jurisprudence, are either described briefly or omitted entirely from this general overview.  For a complete discussion of the current foreclosure process, see *Michigan's New Foreclosure Process*, 29 Mich Real Prop Rev at 51.  And for a comprehensive overview of the prior foreclosure process, see Smith, *Foreclosure of Real Property Tax Liens*, 75 Mich B J 953 (1996).

[11] MCL 211.78(8)(a).  Seventy-five of Michigan's 83 counties elect to act as the foreclosing governmental unit.  See Michigan Department of Treasury, *New Law Tax Foreclosure Archive* <https://www.michigan.gov/taxes/0,4676,7-238-43535_55601_55605-235134--,00.html> (accessed May 12, 2020) [https://perma.cc/L9V2-BC35].

[12] MCL 211.44; MCL 211.45; see also OAG, 2014, No. 7,279 (June 11, 2014) ("[Real property taxes] are assessed and, in the first instance, collected by the city, township, or village treasurer.").

delinquent, collection is turned over to the foreclosing governmental unit.[13]  If the county elects to serve as the foreclosing governmental unit, it may create a "delinquent tax revolving fund" that funds local municipalities for the unpaid delinquent taxes.[14]  The county treasurer then attempts to collect the delinquent taxes.[15]

On March 1 of each tax year, taxes due in the immediately preceding year that remain unpaid are returned to the county treasurer as "delinquent."[16]  Notice of the delinquency, which must explain the effect of failing to pay the tax delinquency and the possibility of foreclosure, must be afforded to property owners throughout the next 12 months.[17]  On March 1 of the year following delinquency, properties with delinquent taxes are "forfeited" to the county treasurer for the amount of the tax delinquency, as well as any

---

[13] MCL 211.55.

[14] MCL 211.87b.  Local municipalities rely heavily on real-property taxes for revenue streams.  Thus, counties use the delinquent tax revolving fund to advance municipalities' funds that would otherwise come from the unpaid real-property taxes.  This advance allows local municipalities to continue with their day-to-day operations without having to wait for payment of the delinquent property taxes.

[15] Any taxes, interest, penalties, and fees subsequently collected by the county treasurer are deposited into the delinquent tax revolving fund.  If delinquent property taxes are not collected, properties are foreclosed and typically sold at a public auction known as a tax-foreclosure sale.  In disbursing the proceeds from the tax-foreclosure sale, the first priority is to reimburse the delinquent tax revolving fund for "all taxes, interest, and fees on all of the property . . . ."  MCL 211.78m(8)(a).  If the county is ultimately unable to collect the entire amount it advanced to the municipalities, either by tax collection or foreclosure sales, then the county can charge the municipalities back the uncollected amount.  MCL 211.87b(1).  When a surplus exists, the county board of commissioners may transfer the surplus into the county's general fund.  MCL 211.78m(8)(h).

[16] MCL 211.78a(2).

[17] See MCL 211.78a through MCL 211.78c; MCL 211.78f.

interest, penalties, and fees associated with the delinquency.[18]  Notably, the term "forfeiture," as used in the GPTA, means only that a foreclosing governmental unit may seek a judgment of foreclosure if the property is not redeemed; it does not affect title.[19]

Once forfeiture occurs, the county treasurer must record a certificate of forfeiture with the county register of deeds, placing all parties with an interest in the property on notice that the property has been forfeited to the county treasurer, that the property has not been redeemed, and "that absolute title to the property will vest in the county treasurer on the March 31 immediately succeeding the entry of a judgment foreclosing the property . . . ."[20]  Forfeited property may be redeemed at any time on or before that March 31 date if the total amount of unpaid delinquent taxes, interest, penalties, and fees are paid to the county treasurer.[21]  Meanwhile, foreclosing governmental units must file a petition for foreclosure with the circuit court that presides over where the forfeited property is located no later than the 15th day of June following the forfeiture.[22]  The petition must "seek a judgment in favor of the foreclosing governmental unit for the forfeited unpaid

---

[18] MCL 211.78g(1).

[19] MCL 211.78(8)(b) (" 'Forfeited' or 'forfeiture' means a foreclosing governmental unit may seek a judgment of foreclosure under [MCL 211.78k] if the property is not redeemed as provided under [the GPTA], but does not acquire a right to possession or any other interest in the property.").

[20] MCL 211.78g(2).

[21] MCL 211.78g(3)(a).  This subsection details additional taxes, interest, and fees that must be paid to the county treasurer in order to successfully redeem the property.  MCL 211.78g(3)(b) through (d).

[22] MCL 211.78h(1).

9

delinquent taxes, interest, penalties, and fees listed against each parcel of property . . . [and] shall request that a judgment be entered vesting absolute title to each parcel of property in the foreclosing governmental unit, without right of redemption."[23]

A judicial foreclosure hearing must be held in the circuit court within 30 days of March 1 of the year after the petition for foreclosure is filed.[24] After the judicial foreclosure hearing, the judgment of foreclosure must be entered by March 30, with an effective date of March 31.[25] Unless the delinquent taxes, interest, penalties, and fees are paid on or before March 31, fee simple title to the property vests absolutely in the foreclosing governmental unit without any further redemption rights available to the delinquent taxpayer.[26] Thereafter, the foreclosing governmental unit's title to the property is not subject to any recorded or unrecorded lien.[27]

After foreclosure, and assuming the state, city, village, township, or county where the property is located does not purchase the property, the GPTA provides for one or more auction sales beginning on the third Tuesday in July immediately succeeding the entry of

[23] *Id*. Forfeited properties listed in the petition may be redeemed after the petition for foreclosure is filed, in which case the properties are removed from the petition for foreclosure. MCL 211.78h(2).

[24] MCL 211.78h(5). In the meantime, the GPTA provides for various notices and hearings that must be given before foreclosure is finalized. These include various notices by mail, publication, recordation, and even a personal visit to the property, see MCL 211.78h through MCL 211.78i, as well as a show cause hearing within seven days of the judicial foreclosure hearing, see MCL 211.78j.

[25] MCL 211.78k(5). The final redemption date is March 31. *Id*.

[26] MCL 211.78k(5) and (6).

[27] MCL 211.78k(6).

the judgment of foreclosure.[28] Once sold, the foreclosing governmental unit deposits the sale proceeds into an account designated as the "delinquent tax property sales proceeds for the year [the taxes became delinquent]" (hereinafter, the account).[29]

Importantly, the account is comprised of the proceeds of all sales for that year, such that the proceeds of a single sale are commingled with the proceeds of all the other sales.[30] The foreclosing governmental unit then distributes the proceeds in the account in a specific order of priority. The first priority is to reimburse the delinquent tax revolving fund for the full amount of unpaid taxes, interest, and fees owed on the property.[31] This is followed by the annual costs incurred as a result of conducting foreclosure sales and general

---

[28] MCL 211.78m(2). All property not sold on or before December 30 immediately succeeding entry of the judgment of foreclosure is transferred to the city, village, or township where the property is located unless the city, village, or township objects to the transfer. MCL 211.78m(6). If the property remains unsold and is not transferred to the city, village, or township, the foreclosing governmental unit retains the property. *Id.*

[29] MCL 211.78m(8). Notably, this account is a subsidiary account within the delinquent tax revolving fund. The delinquent tax revolving fund is segregated into separate accounts for each year's delinquent taxes. Those accounts continue to exist until all the delinquent taxes for that tax year have been collected. See generally Michigan Department of Treasury, *2001-5 Delinquent Tax Revolving Funds Revisions To Accounting After Public Act 123 of 1999* (February 8, 2001), available at <https://www.michigan.gov/treasury/0,4679,7-121-1751_2194-6024--,00.html> (accessed May 13, 2020) [https://perma.cc/395W-FWHC].

[30] Money and property within the delinquent tax revolving fund, however, remain separate from any other money, property, or assets in the custody of the county treasurer. MCL 211.87b(1).

[31] MCL 211.78m(8)(a). In fact, the GPTA requires the delinquent tax revolving fund to be reimbursed regardless of "whether or not all of the property was sold." *Id.*

overhead in conducting the foreclosure proceedings for the year.[32] The statutory scheme for reimbursement is quite exhaustive and even includes costs for maintaining property foreclosed under the GPTA, defending title actions, and administering the foreclosure and the disposition of forfeited property for delinquent taxes.[33]

The parties acknowledge that sale proceeds are often insufficient to cover the full amount of the delinquent taxes, interest, penalties, and fees related to the foreclosure and sale of the property. But when there are excess proceeds from individual sales, such as the sale of plaintiffs' properties in this case, those proceeds are used to subsidize the costs for *all* foreclosure proceedings and sales for the year of the tax delinquency, as well as any years prior or subsequent to the delinquency.[34] Then, after the required statutory disbursements are made, surplus proceeds may be transferred to the county general fund in cases in which the county is the foreclosing governmental unit.[35] Of particular importance here, the GPTA does not provide for any disbursement of the surplus proceeds to the former property owner, nor does it provide former owners a right to make a claim for these surplus proceeds. Michigan is one of nine states with a statutory scheme that requires the

---

[32] MCL 211.78m(8)(b) and (c).

[33] MCL 211.78m(8)(e), (f)(*ii*), and (f)(*iii*).

[34] MCL 211.78m(8)(b) through (d); MCL 211.78m(8)(f)(*i*).

[35] MCL 211.78m(8)(h). In cases in which the state is the foreclosing governmental unit, "any remaining balance shall be transferred to the land reutilization fund created under [MCL 211.78n]." MCL 211.78m(8)(g).

foreclosing governmental unit to disperse the surplus proceeds to someone other than the former owner.[36]  It is under this framework that we review plaintiffs' takings claim.

### III. STANDARD OF REVIEW

This Court reviews a circuit court's decision regarding a motion for summary disposition, as well as any constitutional issues, de novo.[37]

### IV. ANALYSIS

#### A. "FORFEITURE" UNDER THE GPTA AND CIVIL-ASSET FORFEITURE

Before turning to plaintiffs' takings claim, we first address why the trial court's reliance on the term "forfeiture" in the GPTA was incorrect and why the panel majority erred by relying on *Bennis v Michigan*, a case involving civil-asset forfeiture, to conclude that no taking occurred in this case.

First, the GPTA makes clear that "forfeiture" simply permits defendants to seek a judgment of foreclosure.[38]  Forfeiture does not affect title, nor does it give the county

---

[36] Comment, *State Theft In Real Property Tax Foreclosure Procedures*, 54 Real Prop Tr & Est L J 93, 101-102 & n 56 (2019) (explaining that Alabama, Arizona, Illinois, Indiana, Michigan, Minnesota, Mississippi, Montana, and Oregon all require the foreclosing governmental unit "to do something with the foreclosure sale surplus other than return it to the original owner").

Recent legislation has been proposed requiring the foreclosing governmental unit, in instances in which sale of the property exceeds the minimum bid at auction, to "remit an amount equal to that excess" to the former property owner if the property was owned and occupied as a principal residence before the judgment of foreclosure was entered.  See 2019 HB 4219.

[37] *Sidun v Wayne Co Treasurer*, 481 Mich 503, 508; 751 NW2d 453 (2008).

[38] MCL 211.78(8)(b).

treasurer (or the state if the state is the foreclosing governmental unit) any rights, titles, or interests to the forfeited property. Therefore, we reject the premise that plaintiffs "forfeited" all rights, titles, and interests they had in their properties by failing to pay their real-property taxes.

Second, *Bennis* is distinguishable because the purpose of civil-asset forfeiture is different than the purpose of the GPTA provisions at issue here. *Bennis* recognized that civil-asset forfeiture "serves, at least in part, to punish the owner" of property.[39] But the GPTA is not punitive in nature. Its aim is to encourage the timely payment of property taxes and to return tax-delinquent properties to their tax-generating status, not necessarily to punish property owners for failing to pay their property taxes.[40] *Bennis* also recognized that civil-asset forfeiture works as a deterrent, preventing property tainted with criminality from being further used for illicit purposes.[41] To this end, the Supreme Court in *Bennis* stated that "[t]he government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other

---

[39] *Bennis*, 516 US at 451-453 (quotation marks and citation omitted).

[40] MCL 211.78(1) ("The legislature finds that there exists in this state a continuing need to strengthen and revitalize the economy of this state and its municipalities by encouraging the efficient and expeditious return to productive use of property returned for delinquent taxes. Therefore, the powers granted in this act relating to the return of property for delinquent taxes constitute the performance by this state or a political subdivision of this state of essential public purposes and functions.").

[41] *Bennis*, 516 US at 452 ("[F]orfeiture . . . serves a deterrent purpose distinct from any punitive purpose. Forfeiture of property prevents illegal uses both by preventing further illicit use of the property and by imposing an economic penalty, thereby rendering illegal behavior unprofitable.") (quotation marks, brackets, and citation omitted).

14

than the power of eminent domain."[42] We conclude that *Bennis* is distinguishable and provides us little guidance as it relates to plaintiffs' takings claim. The Court's holding in *Bennis* focused narrowly on forfeited property that was used as an instrumentality for criminal activity and the government's interest in deterring illegal activity.[43] In this case, plaintiffs did not use their properties for illicit purposes. They simply failed to pay their property taxes, which is not a criminal offense.[44] Accordingly, we conclude that the Court of Appeals improperly conflated the meaning of "forfeiture" in an unrelated area of law with the meaning of "forfeiture" as expressly described under the GPTA.

---

[42] *Id.*

[43] *Id.* at 453 (explaining that the forfeiture of the petitioner's car used in her husband's criminal activity was consistent with longstanding punitive, deterrent, and remedial goals underlying civil-asset forfeiture); *id.* at 455 (Thomas, J., concurring) (holding that the forfeiture was permissible because the car was used as an instrumentality of crime and the petitioner did not argue otherwise); *id.* at 458 (Ginsburg, J., concurring) ("Michigan has decided to deter johns from using cars they own (or co-own) to contribute to neighborhood blight, and that abatement endeavor hardly warrants this Court's disapprobation.").

[44] As the Supreme Court of Appeals of Virginia in *Martin v Snowden*, 59 Va 100, 142-143 (1868), aff'd sub nom *Bennett v Hunter*, 76 US 326 (1869), stated:

> This forfeiture cannot be sustained as a forfeiture for crime . . . . In such cases, the thing forfeited is the instrument by which the offence was committed, or was the fruit of the offence, and is treated as being itself, in some sort, the offender. But the land of a delinquent tax-payer cannot be brought within the principle of this class of cases; it is neither the instrument nor the fruit of any offence. Nor can we suppose that Congress intended to make it a criminal, or even a *quasi* criminal offence, for a man not to pay his taxes . . . .

## B.  DUE PROCESS

We also reject defendants' argument that no taking occurred in this case because plaintiffs were afforded the minimal protections of due process.  The United States and Michigan Constitutions dictate that before the government may take property for unpaid taxes, it must provide the property owner sufficient notice of the delinquency and foreclosure proceedings as well as an opportunity to contest those proceedings.[45]  To this end, the GPTA explicitly states its intent to comply with minimum requirements of due process and not create new rights beyond those prescribed in the Constitutions of our nation or this state.[46]  As long as defendants comply with these due-process considerations, plaintiffs may not contest the legitimacy of defendants' authority to foreclose on their properties for unpaid tax debts, nor may plaintiffs contest the sale of their properties to third-party purchasers.[47]

---

[45] US Const, Am V ("[N]or shall private property be taken for public use, without just compensation."); Const 1963, art 1, § 17 ("No person shall . . . be deprived of life, liberty or property, without due process of law.").

[46] MCL 211.78(2).

[47] See *Jones v Flowers*, 547 US 220, 234; 126 S Ct 1708; 164 L Ed 2d 415 (2006) ("People must pay their taxes, and the government may hold citizens accountable for tax delinquency by taking their property.  But before forcing a citizen to satisfy his debt by forfeiting his property, due process requires the government to provide adequate notice of the impending taking."); *Sidun*, 481 Mich at 509 ("Proceedings that seek to take property from its owner must comport with due process.").

16

A claim of an unconstitutional taking, however, is distinct from a claim of property deprivation without due process of law.[48] In *Lingle v Chevron USA Inc*, the United States Supreme Court discussed the difference between these two constitutional clauses:

> The [Takings] Clause expressly requires compensation where government takes private property for public use. It does not bar government from interfering with property rights, but rather requires compensation in the event of otherwise proper interference amounting to a taking. Conversely, if a government action is found to be impermissible—for instance because it . . . is so arbitrary as to violate due process—that is the end of the inquiry. No amount of compensation can authorize such action.[49]

As *Lingle* suggests, each constitutional provision protects property owners against specific government action, offering different remedies for distinct constitutional violations. The remedy for a taking of private property is just compensation, while the remedy for being deprived of property without due process of law is the return of the property.[50] Notably, plaintiffs do not dispute the legitimacy of defendants' authority to

---

[48] Compare Const 1963, art 10, § 2 (Michigan's Takings Clause) with Const 1963, art 1, § 17 (Michigan's Due Process Clause); see also Peñalver & Strahilevitz, *Judicial Takings or Due Process?*, 97 Cornell L Rev 305, 317-318 (2012) (stating that the Takings Clause and the Due Process Clause of the Fifth Amendment "have frequently been muddled together by courts and commentators alike," but "grammatically they operate independently of one another and the Supreme Court understands them to protect owners against different kinds of government harms") (citation omitted).

[49] *Lingle v Chevron USA Inc*, 544 US 528, 543; 125 S Ct 2074; 161 L Ed 2d 876 (2005) (quotation marks, citation, and emphasis omitted).

[50] *Id*.; see also *Judicial Takings*, 97 Cornell L Rev at 320 ("Distinguishing between the Takings and Due Process Clauses is consistent with the text of the Constitution, but it also provides a richer conceptual vocabulary for evaluating constitutional property claims . . . ."). The GPTA, at one point, limited property owners to a damages action under MCL 211.78*l* whenever "he or she did not receive any notice required under [the GPTA] . . . ." Once the judgment of foreclosure was entered and the former property owner's interest in the property was extinguished, the former owner could not bring an

17

foreclose on their properties, nor do plaintiffs contest the adequacy of defendants' efforts to notify plaintiffs of the tax delinquency, forfeiture, and foreclosure. Instead, plaintiffs challenge defendants' retention of the surplus proceeds as an unconstitutional taking. Plaintiffs ask this Court to reverse the decision of the Court of Appeals and remand to the circuit court for a determination of just compensation. Plaintiffs' request for a determination of just compensation demonstrates that the nature of their claim is a taking without just compensation, not a deprivation of property without due process of law. Therefore, there is no legal basis to conclude that defendants' compliance with the GPTA's notice provisions justifies defendants' retention of the surplus proceeds.

## C. OVERVIEW OF TAKINGS JURISPRUDENCE AND PLAINTIFFS' TAKINGS CLAIM

The Fifth Amendment of the United States Constitution, as applied to the states through the Fourteenth Amendment, provides, in relevant part: "[N]or shall private property be taken for public use, without just compensation."[51]

Comparatively, Michigan's Takings Clause provides, in relevant part:

> Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed

---

action for possession. But, in *In re Petition By Treasurer of Wayne Co for Foreclosure*, 478 Mich 1; 732 NW2d 458 (2007), this Court held that limitation unconstitutional. Thus, property owners can now file a motion to set aside their judgment of foreclosure if the foreclosing governmental unit failed to comply with due process when providing notice to owners.

[51] US Const, Am V; US Const, Am XIV; see *AFT Mich v Michigan*, 497 Mich 197, 217; 866 NW2d 782 (2015) ("The Fifth Amendment is applied to the states through the Fourteenth Amendment."), citing *Chicago, B & Q R Co v Chicago*, 166 US 226, 241; 17 S Ct 581; 41 L Ed 979 (1897).

by law. If private property consisting of an individual's principal residence is taken for public use, the amount of compensation made and determined for that taking shall be not less than 125% of that property's fair market value, in addition to any other reimbursement allowed by law. . . .

"Public use" does not include the taking of private property for transfer to a private entity for the purpose of economic development or enhancement of tax revenues. Private property otherwise may be taken for reasons of public use as that term is understood on the effective date of the amendment to this constitution that added this paragraph.[52]

While we draw on authority discussing and interpreting both clauses, we must keep in mind that Michigan's Takings Clause has been interpreted to afford property owners greater protection than its federal counterpart when it comes to the state's ability to take private property for a public use under the power of eminent domain.[53]

Plaintiffs, as the aggrieved property owners, have filed this inverse-condemnation action alleging that defendants have taken plaintiffs' properties without just compensation. A "taking" for purposes of inverse condemnation means that the government has permanently deprived the property owner of any possession or use of the property without the commencement of formalized condemnation proceedings.[54] When such a taking

---

[52] Const 1963, art 10, § 2.

[53] Compare *Kelo v New London, Conn*, 545 US 469; 125 S Ct 2655; 162 L Ed 2d 439 (2005) (holding that the government's condemnation and transfer of private property to a private entity to facilitate economic development was a permissible "public use" under the Fifth Amendment's Takings Clause), with *Wayne Co v Hathcock*, 471 Mich 445; 684 NW2d 765 (2004) (holding that a similar condemnation and transfer was not a permissible "public use" under Michigan's Takings Clause).

[54] *United States v Clarke*, 445 US 253, 257; 100 S Ct 1127; 63 L Ed 2d 373 (1980) (explaining that the property owner's right to bring an inverse-condemnation action is derived from "the self-executing character of the constitutional provision with respect to compensation") (quotation marks and citation omitted).

occurs, the property owner is entitled to just compensation for the value of the property taken.[55] The government's seizure of real property is the clearest form of a taking requiring just compensation.[56] But a taking can, and often does, encompass more than just the physical deprivation of real, tangible property; it also includes the government's interference with one's personal, intangible property.[57]

In order to assert a takings claim of this nature, a claimant must first establish a vested property right under state law.[58] "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law."[59] Plaintiffs allege that they have a cognizable, vested property right to the surplus proceeds

[55] *Hart v Detroit*, 416 Mich 488, 494; 331 NW2d 438 (1982) (discussing inverse-condemnation actions under Michigan law).

[56] *Horne v Dep't of Agriculture*, 576 US 350; 135 S Ct 2419, 2425-2426; 192 L Ed 2d 388 (2015) (explaining that a "classic" or per se taking occurs when the government directly appropriates private property for its own use).

[57] *AFT Mich*, 497 Mich at 218 ("The term 'taking' can encompass governmental interference with rights to both tangible and intangible property."), citing *Ruckelshaus v Monsanto Co*, 467 US 986, 1003; 104 S Ct 2862; 81 L Ed 2d 815 (1984) ("[I]ntangible property rights protected by state law are deserving of the protection of the Taking Clause . . . ."); see also 1 Cooley, General Principles of Constitutional Law in the United States (1880), p 336 (explaining that the federal Takings Clause protects "anything of value which the law recognizes as such, and in respect to which the owner is entitled to a remedy against any one who may disturb him in its enjoyment," regardless of "whether the property be tangible or intangible").

[58] *In re Certified Question*, 447 Mich 765, 788; 527 NW2d 468 (1994) (*Fun 'N Sun RV, Inc v Michigan*).

[59] *Phillips v Washington Legal Foundation*, 524 US 156, 164; 118 S Ct 1925; 141 L Ed 2d 174 (1998) (quotation marks and citation omitted).

that result from the tax-foreclosure sale of their properties under Michigan law that is protected by Michigan's Takings Clause.

Our "primary objective" in interpreting a constitutional provision such as our state's Takings Clause is "to determine the text's original meaning to the ratifiers, the people, at the time of ratification."[60]  This Court has held that "the *whole* of art 10, § 2 has a technical meaning that must be discerned by examining the 'purpose and history' of the power of eminent domain."[61]  Accordingly, we must canvass the body of law so that we may ascertain the "common understanding" of Article 10, § 2 and the property rights protected thereunder.[62]

## 1.  A HISTORICAL REVIEW OF CLAIMS FOR SURPLUS PROCEEDS FOLLOWING A TAX-FORECLOSURE SALE

This is not the first time a former property owner has made a claim for the surplus proceeds that result from the tax-foreclosure sale of the owner's property.  In *People ex rel Seaman v Hammond*, the plaintiff, referred to as the "relator," purchased land in October 1840 that was sold to satisfy the 1837 taxes.[63]  The relator received the county treasurer's certificate of sale, which, according to statute, entitled the "purchaser" to the deed to the land within two years of the sale (October 1842) unless the land was redeemed.  Before the relator became entitled to the deed, however, the land was sold again in August 1842 to satisfy the 1838 taxes, this time producing a surplus.  According to the statute, the surplus

---

[60] *Hathcock*, 471 Mich at 468.

[61] *Id*. at 471.

[62] *Id*.

[63] *People ex rel Seaman v Hammond*, 1 Doug 276 (Mich, 1844).

was to be deposited in the state treasury to the credit of the "owner or claimant" of the land. After the redemption period expired for the first sale, the relator presented his deed for the land and demanded the surplus proceeds from the second sale, but he was refused. This Court held that the relator, as the *purchaser* of the land, was not entitled to receive the surplus proceeds because, under the statute, he was not the *owner* or *claimant* of the land at the time of the sale, explaining, in relevant part:

> In that statute, whenever mention is made of the person who buys land at a tax sale, he is denominated the *purchaser*, and no title whatever to the land sold, vests in him, until, at the expiration of two years, he receives the treasurer's deed, "which conveyance," says the statute, "shall vest in the person who receives it, an absolute estate in fee simple." Prior to that conveyance, he has only a lien upon the land for the repayment of the amount of the tax paid, with twenty per cent interest; he has no right to interfere with the possession of the owner; he cannot enter upon the land for any purpose whatever, nor can he control the rents and profits.

> \* \* \*

> It is perfectly clear that the individual who has the legal title to the land at the time of the tax sale, is the owner, entitled, under the statute, to the surplus money, if any there be.[64]

Thirty-seven years later, the United States Supreme Court, in *United States v Taylor*, addressed whether a federal statute, which permitted the federal government to conduct tax sales to recover delinquent federal tax debts, gave property owners a right to claim the surplus proceeds that resulted from the tax sales.[65] The Court in *Taylor* concluded that the

---

[64] *Id*. at 279-280.

[65] *United States v Taylor*, 104 US 216, 217-218; 26 L Ed 721 (1881). Although we decide this case based on our state Constitution, we can look for guidance in the decisions of the United States Supreme Court regarding surplus proceeds and the federal Takings Clause.

22

statute allowed for the recovery of the surplus proceeds. Three years later, the Court followed *Taylor* in *United States v Lawton*.[66] In *Lawton*, the appellee's property was seized for a tax delinquency of $88, which grew to $170.50 after interest, penalties, and costs. The board of tax commissioners bought the land on behalf of the United States in satisfaction of the appellee's tax debt. The property was "struck off" for $1,100, leaving a total of $929.50 in excess of the tax debt. The tax debtor sought the surplus but was refused. The Court held that the tax debtor was entitled to the surplus proceeds, stating:

> The land in the present case having been "struck off for" and "bid in" for the United States at the sum of $1,100, we are of [the] opinion that the surplus of that sum, beyond the $170.50 tax, penalty, interest, and costs, must be regarded as being in the treasury of the United States, under the provisions of section 36 of the act of 1861, for the use of the owner, in like manner as if it were the surplus of purchase money received by the United States from a third person on a sale of the land to such person for the non-payment of the tax. It was unnecessary to go through any form of paying money out of the treasury to any officer and then paying it in again to be held for the owner of the land. But, so far as such owner is concerned, the surplus money is set aside as his as fully as if it had come from a third person. If a third person had bid $1,099 in this case, there would have been a surplus of $928.50 paid into the treasury and held for the owner. It can make no difference that the United States acquired the property by bidding one dollar more. *To withhold the surplus from the owner would be to violate the fifth amendment to the constitution*, and deprive him of his property without due process of law *or take his property for public use without just compensation*. If he affirms the propriety of selling or taking more than enough of his land to pay the tax and penalty and interest and costs, and applies for the surplus money, he must receive at least that.[67]

---

[66] *United States v Lawton*, 110 US 146; 3 S Ct 545; 28 L Ed 100 (1884).

[67] *Id*. at 149-150 (emphasis added).

The Supreme Court later clarified the holding of *Lawton* in *Nelson v City of New York*.[68] In *Nelson*, the city of New York foreclosed on properties for water charges that went unpaid for four years. As in *Lawton*, the delinquencies were far lower than the value of the properties, yet the city kept the surplus proceeds after the properties were sold.[69] The property owners challenged the city's retention of these surplus proceeds under the city's tax-lien foreclosure statute. The Court concluded that it was undisputed that the statutory notice provisions were complied with and that the application of the statute did not deprive the plaintiffs of procedural due process.[70] The Court then turned to and rejected the plaintiffs' takings claim. The Court explained that the plaintiffs' reliance on *Lawton* was inappropriate because the takings claim asserted in *Lawton* was premised on a statutory right to the proceeds. The statute in *Lawton required* that the surplus proceeds be paid to the former property owner, thus rendering the government's failure to return those surplus proceeds an unconstitutional taking. The statute in *Nelson*, in contrast, did not require the surplus proceeds to be paid back to the property owner. Still, the city's statute provided a property owner a path to obtain the surplus proceeds from the sale. Specifically, the statute

---

[68] *Nelson v City of New York*, 352 US 103; 77 S Ct 195; 1 L Ed 2d 171 (1956).

[69] The water charges for the first parcel amounted to $65. The first parcel's property value was assessed at $6,000, and it ultimately sold for $7,000. The water charges for the second parcel amounted to $814.50. The second parcel's property value was assessed at $46,000, but the city acquired title to that parcel and retained it. *Id*. at 105-106.

[70] *Id*. at 108-109 ("We conclude . . . that the City having taken steps to notify appellants of the arrearages and the foreclosure proceedings and their agent having received such notices, its application of the statute did not deprive appellants of procedural due process."). The Court also rejected the plaintiffs' equal-protection challenge. *Id*. at 109.

24

permitted a property owner to file a timely answer in the foreclosure proceeding asserting an interest in the property that exceeded the tax debt.  Upon proof of the owner's allegation, a separate sale would be directed so that the owner could receive the surplus.[71]  Because the plaintiffs failed to avail themselves of this opportunity, the Court concluded that they were not entitled to relief.  The Court explained:

> What the City of New York has done is to foreclose real property for charges four years delinquent and, *in the absence of timely action* to redeem or *to recovery any surplus*, retain the property *or the entire proceeds of its sale*. We hold that nothing in the Federal Constitution prevents this where the record shows adequate steps were taken to notify the owners of the charges due and the foreclosure proceedings.[72]

Significantly, *Seaman*, *Lawton*, and *Nelson* all address a former property owner's *statutory* right to recover the surplus proceeds.  *Seaman* recognized that the owner or claimant of the land at the time of the tax-foreclosure sale had a statutory right to recover the surplus.  Consistent with *Seaman*, *Lawton* not only recognized this statutory right but also made it clear that a Takings Clause violation will arise when a tax-sale statute grants a former owner an independent property interest in the surplus proceeds and the government fails to return that surplus.  *Nelson*, on the other hand, informs us that no federal Takings Clause claim will exist when there is a statutory path to recover the surplus proceeds but the property owners fail to avail themselves of that procedure.  Read together, *Lawton* and *Nelson* establish that the Takings Clause under the United States Constitution may afford former property owners a remedy when a tax-sale statute provides the divested

---

[71] *Id*. at 110 & n 10.

[72] *Id*. at 110 (emphasis added).

25

property owner an interest in the surplus proceeds and the government does not honor that statutory interest. What *Seaman*, *Lawton*, and *Nelson* do not tell us, however, is what occurs when the statutes governing foreclosure make no mention of, or expressly preclude, a divested property owner's right to the surplus proceeds, but the divested property owner establishes a property right to the surplus proceeds through some other legal source, such as the common law.[73] In that instance, the failure to provide the divested property owner an avenue for recovering the surplus proceeds would produce an identical result to *Lawton*: "Property to which an individual is legally entitled has been taken without recourse."[74] Michigan's statutory scheme under the GPTA does not recognize a former property owner's statutory right to collect these surplus proceeds.[75] Therefore, we must determine whether plaintiffs have a vested property right to these surplus proceeds through some other legal source, such as the common law.

## 2. VESTED PROPERTY RIGHTS UNDER THE COMMON LAW

Like the founders of our nation, Michigan has historically held property rights in the highest regard. Former Michigan Supreme Court Justice Thomas M. Cooley, one of

---

[73] And even if those cases had directly addressed the issue presented here, they would provide only helpful guidance; our decision interpreting Michigan's Constitution would not be bound by them.

[74] *Coleman v Dist of Columbia*, 70 F Supp 3d 58, 80 (D DC, 2014), citing *Lawton*, 110 US at 149; see also Clifford, *Massachusetts Has A Problem: The Unconstitutionality of the Tax Deed*, 13 U Mass L Rev 274, 287 (2018) ("In summary, the *Coleman* court recognized that once a state recognizes a property interest in the taxpayer, it cannot summarily remove that interest.").

[75] See MCL 211.78m(8)(h) (directing that any surplus proceeds from the tax-foreclosure sale be transferred into the county's general fund).

our nation's preeminent jurists and learned scholars, wrote that the "right to private property is a sacred right; . . . it was the old fundamental law, springing from the original frame and constitution of the realm."[76]

> [P]roperty . . . is recognized as such by the law, and nothing else is or can be. Property and law are born and must die together. Before the laws, there was no property; take away the laws, all property ceases.[77]

Drawing on Sir William Blackstone, Justice Cooley further recognized that the Magna Carta "guaranteed" the protection of private property against government overreach.[78] Just as the Magna Carta guaranteed property owners due process of law, so too did the sacred text limit the King's ability to take his subject's property, real or personal, under principles of eminent domain.[79] Thus, it is without surprise that private-property

---

[76] 2 Cooley, Constitutional Limitations (8th ed), p 745 (quotation marks and citation omitted).

[77] Cooley, General Principles, p 315 (quotation marks and citation omitted).

[78] Cooley, Constitutional Limitations, pp 733-734, citing 4 Blackstone, Commentaries on the Laws of England, p *424.

[79] See Magna Carta, Grant 39 (1215) ("No freeman shall be . . . disseised . . . unless by the lawful judgment of his peers, or by the law of the land."); see also *Horne*, 135 S Ct at 2426 (discussing the history of the federal Takings Clause going as far back as the Magna Carta and making no distinction between real or personal private property); *Silver Creek Drain Dist v Extrusions Div, Inc*, 468 Mich 367, 373, 374 & n 6; 663 NW2d 436 (2003) (explaining that the sovereign's power of eminent domain and its "ancient provenance" dates back to the Magna Carta); *Peterman v Dep't of Natural Resources*, 446 Mich 177, 186-187 & 187 n 14; 521 NW2d 499 (1994) (discussing the history of eminent domain in America).

rights have been protected from unlawful government takings in every version of this state's Constitution.[80]

"This state's common law is adopted from England, and to identify such law this Court may consider original English cases and authorities."[81] Our review of English common law supports the notion that an owner of real or personal property has a right to any surplus proceeds that remain after property is sold to satisfy a tax debt. Just as the Magna Carta protected property owners from uncompensated takings, it also recognized that tax collectors could only seize property to satisfy the value of the debt payable to the Crown, leaving the property owner with the excess.[82] In fact, although the "mode of collecting the land tax in England was by distress," it was a well-recognized principle that

---

[80] See Const 1835, art 1, § 19; Const 1850, art 18, § 14; Const 1908, art 13, § 1; Const 1963, art 10, § 2.

[81] *People v Woolfolk*, 497 Mich 23, 25; 857 NW2d 524 (2014) (citations omitted).

[82] See Johnson, *The Ancient Magna Carta and the Modern Rule of Law: 1215 to 2015*, 47 St Mary's L J 1, 47 (2015), citing McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* (Glasgow: James Maclehose & Sons, 2d ed, 1914), p 322. Johnson explains that when a man died, officers would seek collection of the deceased's debts. *Ancient Magna Carta*, 47 St Mary's L J at 47. However, these officials would often seize everything, sell the decedent's property for an amount far in excess of the debt, and refuse to disgorge the surplus to the decedent's heirs. *Id*. As a protection against such abuse practices, Clause 26 of the Magna Carta required that "the value of the goods seized had to approximate the value of the debt[,] and the process had to be superintended by worthy men whose function it was to form a check on the actions of the sheriff's officers." *Id*. (quotation marks and citation omitted); see also *Martin*, 59 Va at 136 ("The summary methods employed in England in early times for the collection of debts to the Crown seem to have been turned to purposes of oppression, and . . . [the] *Magna Charta* provided for their restraint.").

any excess property sold to satisfy a tax debt would be paid back to the owner.[83]  Further, Blackstone explained that in the context of bailments, whenever the government seized property for delinquent taxes, it did so subject to "an implied contract in law" to either return the property if the tax debt was paid or "to render back the overplus" if the property was sold to satisfy the delinquent taxes.[84]

The right to collect the surplus proceeds was also firmly established in the early years of Michigan's statehood.  In his treatise on the Law of Taxation, Justice Cooley discusses the various methods that states used to save the surplus proceeds for the former owner when that owner's land was sold for unpaid taxes.[85]  The first of these methods was to sell the distressed land for payment of delinquent taxes, and if the accepted bid exceeded the delinquency, the surplus would be deposited with the local treasury "for the benefit of the party, who shall show his right."[86]  This is precisely what occurred in *Seaman*.  While *Seaman* was resolved on then-existing statutory authority, this Court's discussion regarding a property owner's right to collect surplus proceeds is valuable in defining the nature and scope of that right:

---

[83] *Martin*, 59 Va at 136-137 (explaining that while land was typically only taken to satisfy tax debts when personal property was insufficient to satisfy the debt, any surplus resulting from the sale of the property taken, real or personal, would be paid back to the owner).

[84] 2 Blackstone, Commentaries on the Laws of England, p *452.

[85] Cooley, Law of Taxation (3d ed), p 952.

[86] *Id*.  As support for this first method, Justice Cooley cites the Supreme Court's decision in *Lawton* for the notion that if land was sold to the United States for unpaid federal taxes, the United States remained liable to the former owner for any surplus.  *Id*. at 952 & n 1, citing *Lawton*, 110 US 146.

The surplus money produced by the tax sale, is the property of the person who has the legal title to the land at the time of the sale, and the moment the amount is ascertained and passed to his credit in the books of the treasurer, it is as absolutely his as though it were in his own keeping; and the right is personal—as unqualifiedly so as the ownership of any chattel; and although the surplus spoken of is produced by the sale of land, yet the right to receive and control it, no more follows the title to the land, than does the ownership of the cattle and farming utensils that a man may happen to have on his farm when it is sold for taxes, and the purchaser may, with as much propriety, claim a right to the latter as the former.[87]

Notably, at the time *Seaman* was decided, a property owner's right to redeem his property continued after the foreclosure sale. That is, it was commonly understood that the delinquent taxpayer would continue to be the legal owner of the property at the time of the foreclosure sale and thus would be entitled to any surplus proceeds produced from the sale as the "owner or claimant" of the land. This is vastly different from the current version of the GPTA, in which a property owner's interest in the property is extinguished well before the tax-foreclosure sale. Thus, a fair reading of *Seaman* demonstrates that in the early years of this state, it was commonly understood that the delinquent taxpayer, not the foreclosing entity, continued to own the land at the time of the tax-foreclosure sale and would have been entitled to any surplus, which no more followed title to the land than the former owner's other personal property.

At the same time that it was common for any surplus proceeds to be returned to the former property owner, it was also generally understood that the government could only collect those taxes actually owed and nothing more. Justice Cooley explained that excessive tax levies were "beyond the jurisdiction of the officers" charged with collecting

---

[87] *Seaman*, 1 Doug at 281.

30

taxes and that even *de minimis* amounts in excess of the taxes owed were impermissible.[88] This Court recognized a similar principle in 1867, stating that "[n]o law of the land authorizes the sale of property for any amount in excess of the tax it is legally called upon to bear."[89] Indeed, any sale of property for unpaid taxes that was in excess of the taxes owed was often rendered voidable at the option of the landowner.[90] Rather than selling all of a person's land and risk the sale being voided, officers charged with selling land for unpaid taxes often only sold that portion of the land that was needed to satisfy the tax debt.[91] That is, early in Michigan's statehood, it was commonly understood that the government could not collect more in taxes than what was owed, nor could it sell more land than necessary to collect unpaid taxes.

Further, in the context of eminent domain, it was axiomatic that the government shall take no more property than necessary for the particular public use for which the taking was done. As Justice Cooley stated:

---

[88] Cooley, Law of Taxation, pp 590-591 ("If the line which the legislature has established be once passed, we know of no boundary to the discretion of the assessors.") (quotation marks and citation omitted).

[89] *Case v Dean*, 16 Mich 12, 19 (1867).

[90] Cooley, Law of Taxation, p 953 ("A sale of the whole when less would pay the tax would be such a fraud on the law as to render the sale voidable at the option of the land-owner . . . .").

[91] *Id*. at 952-958. Indeed, this was another method discussed by Justice Cooley to ensure that any "surplus moneys" remained with the landowner after the property was sold. *Id*. at 952-953. The other method was to require that a lien be placed on the land holding the purchaser accountable to pay the excess back to the original owner. *Id*. at 952.

31

The taking of property must always be limited to the necessity of the case, and consequently no more can be appropriated in any instance than the proper tribunal shall adjudge to be needed for the particular use for which the appropriation is made. When a part only of a man's premises is needed by the public, the necessity for the appropriation of that part will not justify the taking of the whole, even though compensation be made therefor. The moment the appropriation goes beyond the necessity of the case, it ceases to be justified on the principles which underlie the right of eminent domain.[92]

This Court has consistently recognized this constitutional precept. Throughout this state's history, this Court has held that the government's takings power is limited to only that property which is necessary to serve the public.[93]

Accordingly, these fundamental principles—that the government shall not collect more taxes than are owed, nor shall it take more property than is necessary to serve the public—protect taxpayers and property owners alike from government overreach. These

---

[92] Cooley, Constitutional Limitations, p 1147.

[93] See *Peterman*, 446 Mich at 201, 202 n 36 ("As an unnecessary taking of property, defendant's actions violated the strict dictates of the constitutional guarantee that private property may be taken only when necessary for public purposes."); *Livonia Twp Sch Dist v Wilson*, 339 Mich 454, 460; 64 NW2d 563 (1954) ("It is a general principle that the legislature cannot authorize the taking of property in excess of that required for public use."); *Cleveland v Detroit*, 322 Mich 172, 179; 33 NW2d 747 (1948) ("In acquiring property for public use it is not permissible for the city to take additional property not necessary for that public use for private purposes."); *Berrien Springs Water Power Co v Berrien Circuit Judge*, 133 Mich 48, 53; 94 NW 379 (1903) ("[O]nly so much [land] can be taken as is necessary to the public use."); *Bd of Health of Portage Twp v Van Hoesen*, 87 Mich 533, 537; 49 NW 894 (1891) ("It can never be just to take property, under pretence of public benefit, which is not needed by the public . . . ."), citing *Paul v Detroit*, 32 Mich 108, 114 (1875) (explaining that the 1850 Michigan Constitution added a provision requiring juries to determine the necessity of a taking of private property for public use, as well as the compensation owed for that taking, because there was "a well founded belief, founded on experience, that private property was often taken improperly and without any necessity").

principles have remained a staple in this state's jurisprudence well after the most recent ratification of our Constitution in 1963.[94]

A property owner's right to collect the surplus proceeds from the tax-foreclosure sale of his or her property has also withstood the most recent ratification of our Constitution, as exemplified by our decision in *Dean v Dep't of Natural Resources*, which recognized a right to collect those proceeds under the common-law claim of unjust enrichment.[95] In *Dean*, the plaintiff-property owner failed to pay her property taxes for both the city of Flint and Genesee County in the amount of $230.68 and $146.90, respectively. After the plaintiff failed to appear at the foreclosure hearing, the court issued a judgment authorizing the sale of the plaintiff's property at a tax sale and stating that if the property was sold to the state, the state's title would become absolute unless the plaintiff timely redeemed the property.[96] The state successfully bid on the plaintiff's property, starting the one-year redemption period for the plaintiff. During the redemption period,

---

[94] *Detroit v Walker*, 445 Mich 682, 701-704; 520 NW2d 135 (1994) (explaining that citizens have a duty to pay their taxes and that the Legislature may enact procedural schemes "to secure taxes owed"); *Peterman*, 446 Mich at 184 (" '[I]t can never be lawful to compel any man to give up his property, when it is not needed, or to lose it, whether needed or not, without being made whole.' "), quoting *Paul*, 32 Mich at 119; see also *Fidlin v Collison*, 9 Mich App 157, 167; 156 NW2d 53 (1967) (holding that under the GPTA's provision allowing seizure of personal property to satisfy unpaid taxes, the city treasurer's seizure of the plaintiffs' personal property valued at $629.32 to satisfy a $10,500 tax debt was "an excessive distraint" on their property, given that " '[t]*he amount of property distrained must not be excessive and, if it is, the seizure is illegal*' "), quoting 84 CJS, Taxation, § 694, p 1371.

[95] *Dean v Dep't of Natural Resources*, 399 Mich 84; 247 NW2d 876 (1976).

[96] Notice of the hearing was published in the newspaper as required under the former version of the GPTA. *Id*. at 88, citing MCL 211.66, repealed by 1999 PA 123.

33

the plaintiff paid her delinquent city-property taxes in full but mistakenly failed to pay her delinquent county-property taxes. After she failed to timely redeem her property during the redemption period, the State Treasurer deeded the plaintiff's property to the state, which received absolute title to the property and then sold it to a private investor for $10,000. The plaintiff filed an action against the state, alleging, in relevant part, that the state had been unjustly enriched by retaining the $10,000 following the sale of her property. The circuit court granted summary disposition to the defendant, but this Court reversed, holding that the plaintiff could bring her suit for unjust enrichment:

> In fact, the events out of which plaintiff's claim of unjust enrichment arises occurred subsequent to the default judgment entered by the Genesee County Circuit Court: the alleged good-faith attempt at redemption, the running of the redemption period after this attempt with plaintiff under the impression that she had in fact redeemed her home, the loss of her home, and the sale of the property by the state for a profit of close to $10,000.[97]

*Dean* stands for more than just a recognition of the plaintiff's right to bring a claim under unjust enrichment for the surplus proceeds. Inherent in *Dean*'s holding is Michigan's protection under our common law of a property owner's right to collect the surplus proceeds that result from a tax-foreclosure sale. A viable claim for unjust enrichment requires the complaining party to show that the other party retained a *benefit* from the complaining party.[98] In concluding that the plaintiff in *Dean* stated an actionable claim for unjust enrichment, this Court did not rely on any statutory right that the plaintiff

---

[97] *Dean*, 399 Mich at 94-95.

[98] *Tkachik v Mandeville*, 487 Mich 38, 47-48; 790 NW2d 260 (2010) ("Unjust enrichment is defined as the unjust retention of money or benefits which in justice and equity belong to another. No person is unjustly enriched unless the retention of the benefit would be unjust.") (quotation marks and citations omitted).

34

had to collect the surplus proceeds. As is the case here, title to the plaintiff's property in *Dean* had already vested with the state. Without a statutory right, the plaintiff must have had a common-law right to these surplus proceeds. Otherwise, her claim of unjust enrichment would not be actionable because it could not have been said that the state retained a *benefit* at her expense. In sum, *Dean* supports the proposition that a property owner has a recognized common-law property right to the surplus proceeds from a tax-foreclosure sale.[99]

We conclude that our state's common law recognizes a former property owner's property right to collect the surplus proceeds that are realized from the tax-foreclosure sale of property. Having originated as far back as the Magna Carta, having ingratiated itself into English common law, and having been recognized both early in our state's jurisprudence and as late as our decision in *Dean* in 1976, a property owner's right to collect the surplus proceeds from the tax-foreclosure sale of his or her property has deep roots in Michigan common law. We also recognize this right to be "vested" such that the right is to remain free from unlawful governmental interference. "To constitute a vested right, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title,

---

[99] While *Dean* stands for the proposition that a claim for the surplus proceeds may be asserted through unjust enrichment, the Court of Appeals concluded that plaintiffs abandoned their claim of unjust enrichment by failing to develop it in their briefing below. See *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) (explaining that a party's failure to adequately brief an issue on appeal constitutes abandonment).

legal or equitable, to the present or future enjoyment of property . . . ."[100] As demonstrated by the discussion earlier, the right to collect these proceeds was beyond a mere expectancy or claim of entitlement. It is as much an interest in property as our kitchen tables; television sets; and, as this Court observed in *Seaman*, our cattle and farming utensils.[101] Further, the prohibitions against collecting excess taxes, selling more land than needed to collect such taxes, and taking more property than necessary to serve the public all underlie a property owner's right to collect the surplus proceeds and were well-established legal principles before 1963. Therefore, we hold that the ratifiers would have commonly understood this common-law property right to be protected under Michigan's Takings Clause at the time of the ratification of the Michigan Constitution in 1963.[102]

---

[100] *Fun 'N Sun*, 447 Mich at 788 (quotation marks and citation omitted); Cooley, General Principles, p 320 ("The test of unlawful interference with property is that *vested* rights are abridged or taken away.") (emphasis added).

[101] An often-used metaphor in property law further illustrates this point. Property rights are commonly referred to as a "bundle of sticks," with each stick representing a distinct right defined by state law. *United States v Craft*, 535 US 274, 278; 122 S Ct 1414; 152 L Ed 2d 437 (2002) ("A common idiom describes property as a 'bundle of sticks'—a collection of individual rights which, in certain combinations, constitute property. State law determines only which sticks are in a person's bundle.") (citation omitted). These sticks range from a property owner's right to use or enjoy the property, the right to eject others from the property, and the right to dispose of the property altogether. See *Adams v Cleveland-Cliffs Iron Co*, 237 Mich App 51, 57; 602 NW2d 215 (1999) ("The general concept of 'property' comprises various rights—a 'bundle of sticks,' as it is often called— which is usually understood to include '[t]he exclusive right of possessing, enjoying, and disposing of a thing.' "), quoting *Black's Law Dictionary* (6th ed), p 1216. Unlawful governmental interference with even one stick in that bundle constitutes a taking requiring just compensation. Our holding today recognizes that the right to collect any surplus proceeds that result from the sale of a person's property for unpaid taxes is one stick in the owner's bundle of rights, entitled to as much protection as any other stick in that bundle.

[102] *Hathcock*, 471 Mich at 471.

36

Having recognized both the existence of this vested property right at common law and that the ratifiers of the 1963 Michigan Constitution would have commonly understood this right to be protected under Michigan's Takings Clause at that time, the question now becomes whether the amendments of the GPTA abrogated this common-law right.[103] If it did, there is no taking here.

The common law "is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just . . . ."[104] It is dynamic and flexible, not static or fixed like statutory law.[105] The common law is, however, incremental in adapting to society's changing circumstances, developing gradually to reflect our policies, customs, norms, and values.[106] Nonetheless, the Legislature may enact legislation that abrogates or alters the common law. Of course, both legislation and the common law are secondary to our Constitution. Article 3, § 7 of Michigan's Constitution provides:

---

[103] While the bulk of the revisions to the GPTA took place in 1999, the provision allowing counties to transfer any surplus proceeds to their general funds, MCL 211.78m(8)(h), was not added until 2006. See 2006 PA 498.

[104] *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 242; 828 NW2d 660 (2013) (quotation marks and citation omitted).

[105] *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 430; 157 NW2d 213 (1968) ("The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law . . . .") (quotation marks and citation omitted).

[106] *Price*, 493 Mich at 243 ("The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances.").

The common law and the statute laws now in force, *not repugnant to this constitution*, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.[107]

It is clear that our 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. This right existed at common law; was commonly understood to exist in the common law before the 1963 ratification of our Constitution; and continues to exist after 1963, as our decision in *Dean* demonstrates. Because this common-law property right is constitutionally protected by our state's Takings Clause, the Legislature's amendments of the GPTA could not abrogate it. While the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause.[108]

---

[107] Const 1963, art 3, § 7 (emphasis added).

[108] Nothing in our holding today prevents the Legislature from enacting legislation that would require former property owners to avail themselves of certain procedural avenues to recover the surplus proceeds. See, e.g., *Nelson*, 352 US at 110 & n 10. We only hold that the Legislature may not write this constitutionally protected vested property right out of existence. See *Munn v Illinois*, 94 US 113, 134; 24 L Ed 77 (1876) ("A person has no property, no vested interest, in any rule of the common law. . . . Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, *unless prevented by constitutional limitations*.") (emphasis added); see also *Mackin v Detroit-Timkin Axle Co*, 187 Mich 8, 13; 153 NW 49 (1915) ("*Except as to vested rights*, the legislative power exists to change or abolish existing statutory and common-law remedies.") (emphasis added). Further, because this common-law property right existed well before 1963, it cannot be said that our Constitution created this property right; rather, this right was, and still is, commonly understood to be *protected* by Michigan's Takings Clause. See *Phillips*, 524 US at 164 ("[T]he Constitution protects rather than creates property interests . . . .").

## V. APPLICATION

## A. DEFENDANTS' RETENTION OF THE SURPLUS PROCEEDS WAS AN UNCONSTITUTIONAL TAKING

As the foreclosing governmental unit under the GPTA, defendants were entitled to seize plaintiffs' properties to satisfy the unpaid delinquent real-property taxes as well as any interest, penalties, and fees associated with the foreclosure and sale of plaintiffs' properties. But defendants could only collect the amount plaintiffs owed and nothing more. Once defendants foreclosed on plaintiffs' properties, obtained title to those properties, and sold them to satisfy plaintiffs' unpaid taxes, interest, penalties, and fees related to the foreclosures, any surplus resulting from those sales belonged to plaintiffs. That is, after the sale proceeds are distributed in accordance with the GPTA's order of priority, any surplus that remains is the property of plaintiffs, and defendants were required to return that property to plaintiffs. Defendants' retention of those surplus proceeds under the GPTA amounts to a taking of a vested property right requiring just compensation. To the extent the GPTA permits defendants to retain these surplus proceeds and transfer them into the county general fund, the GPTA is unconstitutional as applied to former property owners whose properties were sold at a tax-foreclosure sale for more than the amount owed in unpaid taxes, interest, penalties, and fees related to the forfeiture, foreclosure, and sale of their properties.

Defendants rely on a line of Michigan cases to argue that plaintiffs held no rights, titles, or interests in their properties once foreclosure occurs and fee simple title vests with

39

the state.[109]  None of these decisions, however, involved a claim for the surplus proceeds

after a foreclosure sale.  Rather, these cases all addressed the former property owners'

ability to retain or convey an interest in the land that had been foreclosed.  Indeed, one of

these cases even noted that the "primary and inducing purpose of the legislation was to

secure *a portion of the unpaid taxes, rather than nothing*, and to restore lands to a taxpaying

basis, instead of supinely allowing them to accumulate tax delinquencies with no hope of

ever recovering them."[110]  In this case, defendants recovered the entire amount of plaintiffs'

tax debts *and more* by way of a surplus.  Plaintiffs had a cognizable, vested property right

to collect those surplus proceeds.  This vested right did not simply "vanish[] into thin

air."[111]  In the same way that the foreclosure process does not eliminate the former property

owner's interest in the personal property that sits on the foreclosed land, the vesting of fee

simple title to the real property does not extinguish the property owner's right to collect

the surplus proceeds of the sale.  This is a separate property right that survives the

---

[109] *Krench v Michigan*, 277 Mich 168, 179; 269 NW 131 (1936) (holding that a tax-foreclosure sale divests the former owner of title and vests title with the state in fee simple with a new chain of title being formed); *James A. Welch Co, Inc v State Land Office Bd*, 295 Mich 85, 93-95; 294 NW 377 (1940) (holding that after the state received absolute title to land that was sold for delinquent property taxes, the former owner held no greater interest in title to the land than any other stranger); *Meltzer v State Land Office Bd*, 301 Mich 541, 545; 3 NW2d 875 (1942) (affirming *Krench* and *Welch* and concluding that once absolute title to a tax-foreclosed property vests with the state, the former owners hold "no interest in the land at the time of the tax sale").

[110] *Welch*, 295 Mich at 92 (quotation marks and citation omitted; emphasis added).

[111] *Armstrong v United States*, 364 US 40, 48; 80 S Ct 1563; 4 L Ed 2d 1554 (1960) (holding that the government's "total destruction" of the value of a lienholder's lien against government-held property was an unconstitutional taking).

foreclosure process. Accordingly, like any other creditor, defendants were required to return the surplus.[112]

We see no reason to recharacterize these surplus proceeds as public money to be transferred into the county general fund and used for public purposes wholly independent of the GPTA without paying just compensation.[113] While plaintiffs' takings claim was not compensable until their properties sold for an amount in excess of their tax debts, that lack of an immediate right to collect the surplus proceeds does not mean that plaintiffs had no right to collect the surplus proceeds at all.[114] Indeed, a former property owner only has a right to collect the surplus proceeds from the tax-foreclosure sale; that is, a former property owner has a compensable takings claim if and only if the tax-foreclosure sale produces a surplus. Once the sale produces a surplus, the former owner may make a claim for the

---

[112] See *Lawton*, 110 US at 150 ("[S]o far as such owner is concerned, the surplus money is set aside as his as fully as if it had come from a third person. . . . It can make no difference that the United States acquired the property by bidding one dollar more."); *Armstrong*, 364 US at 48 ("[T]he Government for its own advantage destroyed the value of the liens, something that the Government could do because its property was not subject to suit, but which no private purchaser could have done."); see also *Bank of America, NA v First American Title Ins Co*, 499 Mich 74, 91; 878 NW2d 816 (2016) ("No one disputes that the mortgagee is entitled to recover only his debt. Any surplus value belongs to others, namely, the mortgagor or subsequent lienors.") (quotation marks and citation omitted).

[113] See *Webb's Fabulous Pharmacies, Inc v Beckwith*, 449 US 155, 164; 101 S Ct 446; 66 L Ed 2 358 (1980) ("[A] State, by *ipse dixit*, may not transform private property into public property without compensation . . . .").

[114] *Id*. at 162 (explaining that creditors of a deposit account, whose statutory right to collect a portion of the account's interest did not accrue until distribution of the account was ordered, had a cognizable property right despite that right not being immediately compensable).

41

surplus proceeds. Again, this holds true even though the former owner no longer holds title to the property.

Moreover, we are unmoved by caselaw from other states that have addressed the disposition of surplus proceeds. Some courts that have confronted the issue whether a cognizable takings claim can be made for the surplus proceeds have only addressed the issue in the context of the federal Takings Clause.[115] Unlike those courts, however, our holding speaks to Michigan's Takings Clause, which this Court has, on occasion, interpreted as offering broader protection to property owners.[116] Other courts have limited the inquiry to whether there is statutory authority for a property owner to collect the surplus proceeds, not whether a right existed within their states' common law.[117] Moreover, a few

---

[115] See, e.g., *Ritter v Ross*, 207 Wis 2d 476, 484-485; 558 NW2d 909 (1996) (analyzing the former property owners' claim for the surplus proceeds under the federal Takings Clause and holding that no taking under that clause occurred), cert den 522 US 995 (1997); *Auburn v Mandarelli*, 320 A2d 22, 25 (Me, 1974) (same).

[116] See *AFT Mich*, 497 Mich at 217 & n 9 ("Although the courts of this state have applied the state and federal Takings Clauses coextensively in many situations, this Court has found that [Michigan's Takings Clause] offers broader protection than [the federal Takings Clause].") (citation omitted), comparing *Kelo*, 545 US 469, with *Hathcock*, 471 Mich 445.

[117] See, e.g., *Kelly v Boston*, 348 Mass 385, 388; 204 NE2d 123 (1965) ("We think it is clear from the above history of the tax statutes that the Legislature intended the surplus from a sale of land taken for nonpayment of taxes, on which the right of redemption has been foreclosed in the Land Court, to belong to the municipality."); *Automatic Art, LLC v Maricopa Co*, unpublished opinion of the United States District Court for the District of Arizona, issued March 18, 2010 (Case No. CV 08-1484-PHX-SRB), pp 5-7 (holding that, under Arizona's statutory scheme governing tax foreclosures, the government's retention of the surplus proceeds is not an unconstitutional taking because "Arizona law does not provide for the recovery of any funds by a previous owner after a tax sale"); *Reinmiller v Marion Co*, unpublished opinion of the United States District Court for the District of Oregon, issued October 16, 2006 (Case No. CV 05-1926-PK), pp 2-4 (holding the same under Oregon law).

42

courts have addressed the takings issue in the context of other areas of jurisprudence, including tax collection, forfeiture, and due process.[118]  That said, we note that two states, Vermont and New Hampshire, have recognized the government's obligation to return any surplus proceeds to the former owner after a tax-foreclosure sale and that the failure to return those proceeds is a taking under their state constitutions.[119]  Similarly, we hold that defendants were required to return the surplus proceeds to plaintiffs and that defendants' failure to do so constitutes a government taking under the Michigan Constitution entitling plaintiffs to just compensation.

## B.  DEFENDANTS CANNOT RELY ON THE TAXING POWER TO JUSTIFY THEIR RETENTION OF THE SURPLUS PROCEEDS

Defendants also contend that their actions are simply a matter of tax collection and that "there can be no taking when a Michigan county foreclosures on a property for the

---

[118] See, e.g., *Balthazar v Mari Ltd*, 301 F Supp 103, 105 n 6 (ND Ill, 1969) ("Rather than taking private property for a public purpose, Illinois is here collecting taxes which are admittedly overdue."), aff'd 396 US 114 (1969); *Sheehan v Suffolk Co*, 67 NY2d 52, 60; 490 NE2d 523 (1986) ("There is no constitutional prohibition against such a full forfeiture."); *Miner v Clinton Co*, 541 F3d 464, 475 (CA 2, 2008) ("The retention of any surplus from a tax auction is constitutional because there was no violation of plaintiffs' right to due process related to the notices of foreclosure.").

[119] See *Bogie v Barnet*, 129 Vt 46, 55; 270 A2d 898 (1970) ("No justification for the withholding of this excess from the plaintiff, derived as it was from the compelled sale of his land, has been demonstrated.  Its retention by the town amounts to an unlawful taking for public use without compensation, contrary to . . . the Vermont Constitution."); *Polonsky v Bedford*, ___ NH ___; ___ A3d ___ (2020) (Case No. 2019-0339); slip op at 12 (holding that, under New Hampshire's Takings Clause, "the taking of property without just compensation is unconstitutional, even when the municipality has taken the property by tax deed due to the former owner's failure to pay taxes," and that the municipality's failure to return any excess proceeds to the former owner is an unconstitutional taking), citing *Thomas Tool Servs, Inc v Croydon*, 145 NH 218, 220; 761 A2d 439 (2000).

nonpayment of taxes."[120]   The Legislature undoubtedly has the inherent power to levy taxes, and cities and villages also have the authority to impose taxes for public purposes.[121] We recognize that municipalities rely heavily on their citizens to timely pay real-property taxes so that local governments have a source of revenue for their operating costs.[122] Nothing in this opinion impedes defendants' right to hold citizens accountable for failing to pay property taxes by taking citizens' properties in satisfaction of their tax debts.  What defendants may not do under the guise of tax collection is seize property valued far in excess of the amount owed in unpaid taxes, penalties, interest, and fees and convert that surplus into a public benefit.  The purpose of taxation is to assess and collect taxes *owed*, not appropriate property *in excess of what is owed*.  Defendants' ability to take plaintiffs' properties was limited by what plaintiffs actually owed as a result of failing to pay their taxes.  Thus, defendants' retention of the surplus proceeds amounts to a taking of plaintiffs' properties far in excess of plaintiffs' tax debts that cannot be justified as a valid form of tax collection.

---

[120] Defendants' Brief on Appeal (April 3, 2019) at 14.

[121] Const 1963, art 9, § 1 ("The legislature shall impose taxes sufficient with other resources to pay the expenses of state government."); Const 1963, art 7, § 21 ("Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this constitution or by law.").

[122] *Walker*, 445 Mich at 702 ("Traditionally, the property tax—and in particular, the tax on real property—has been the mainstay of municipal revenue-gathering—the largest single source of municipal revenue.") (quotation marks and citation omitted); see also *Tax Liens*, 75 Ind L J at 756 (explaining that property taxes are the primary source of revenue for local governments and that "[t]he failure to collect even a small portion of property taxes can have a dramatic impact on local governments").

Moreover, "the power of taxation should not be confused with the power of eminent domain . . . ."[123] As Justice Cooley has explained, whereas taxation requires citizens to bear the burden of public expenses equally and proportionally, "something exceptional" is taken under the government's exercise of eminent domain such that apportionment cannot be achieved, thus requiring compensation "of a pecuniary nature" to the property owner.[124] By retaining the surplus proceeds and transferring them into the county general fund to be used for public purposes, defendants are forcing delinquent taxpayers to contribute to the general government revenues beyond their fair share. This is not simply an adjustment of "the benefits and burdens of economic life to promote the common good."[125] Rather, this confiscation of the sale proceeds in excess of what is actually owed requires delinquent taxpayers " 'alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' "[126] Michigan's Takings Clause was " 'adopted for the protection of and security to the rights of the individual as against the government . . . .' "[127]

---

[123] *Koontz v St. Johns River Water Mgt Dist*, 570 US 595, 617; 133 S Ct 2586; 186 L Ed 2d 697 (2013) (quotation marks and citation omitted).

[124] Cooley, General Principles, pp 333-334.

[125] See *Penn Central Transp Co v City of New York*, 438 US 104, 124; 98 S Ct 2646; 57 L Ed 2d 631 (1978); see also *AFT Mich*, 497 Mich at 218 ("[G]overnmental action creating general burdens or liabilities, i.e., merely requiring citizens to expend monies for valid public purposes and expenditures, typically will not form the basis for a cognizable taking claim.").

[126] *Webb's Fabulous Pharmacies*, 449 US at 163, quoting *Armstrong*, 364 US at 49.

[127] *Bott v Natural Resources Comm*, 415 Mich 45, 81 n 43; 327 NW2d 838 (1982), quoting *Pearsall v Eaton Co Bd of Supervisors*, 74 Mich 558, 561; 42 NW 77 (1889).

45

To permit such forced contributions to stand would undermine the very rights our Takings Clause seeks to protect.

Put simply, defendants' argument that the taxing power justifies their retention of the surplus proceeds from tax-foreclosure sales over and above property owners' tax liabilities is an exceedingly poor attempt at disguising a physical taking of property requiring just compensation as an arbitrary and disproportionate tax.[128]

### C. JUST COMPENSATION IS EQUAL TO THE AMOUNT OF SURPLUS PROCEEDS GENERATED FROM THE TAX-FORECLOSURE SALE

Having found an unconstitutional taking, we must next decide the method by which just compensation may be determined. This Court has stated that the remedy for a government taking is "just compensation for the value of the property taken."[129] As our holding today makes clear, the property "taken" is the surplus proceeds from the tax-foreclosure sale of plaintiffs' properties to satisfy their tax debts. While it could be said that plaintiffs have received at least some compensation, given that they are no longer liable for their delinquent taxes,[130] satisfaction of plaintiffs' tax debts cannot constitute just

---

[128] See *Acker v Comm'r of Internal Revenue*, 258 F2d 568, 574 (CA 6, 1958) ("[D]espite the breadth of the taxing power conferred by the Constitution, there might arise 'a case where, although there was a seeming exercise of the taxing power, the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation but a confiscation of property; that is, a taking of the same in violation of the 5th Amendment[.]' "), quoting *Brushaber v Union Pacific R Co*, 240 US 1, 24-25; 36 S Ct 236; 60 L Ed 493 (1916).

[129] *Hart*, 416 Mich at 494.

[130] See *State Theft*, 54 Real Prop Tr & Est L J at 124 & nn 219-220 ("In the case of property tax foreclosure, there is some compensation provided to the owner because the proceeds from the property sale are used to satisfy the amount that the property owner owes the government in taxes, interest, and fees. This is a form of compensation because after the

compensation for the value of the property taken, i.e., the surplus proceeds. Therefore, plaintiffs are entitled to the value of those surplus proceeds.

Defendants submit that if plaintiffs have, in fact, pleaded a viable takings claim, then the amount of compensation due could be more than the surplus proceeds from the tax-foreclosure sale. Plaintiffs make this point in their postargument briefing, arguing that a full remedy for an unconstitutional taking requires property owners to be put in as good of position had their properties not been taken at all. That is, while the surplus proceeds from a tax-foreclosure sale are some evidence of the value of the property and compensation due, plaintiffs contend that it may be less than just compensation and may instead constitute the fair market value of their properties.[131]

We reject the premise that just compensation requires that plaintiffs be awarded the fair market value of their properties so as to be put in as good of position had their properties not been taken at all. First, this would run contrary to the general principle that just compensation is measured by the value of the property *taken*. In this case, the property

---

property is sold the former owner's debt is canceled."), citing Comment, *Tax Foreclosure: A Drag On Community Vitality Or A Tool For Economic Growth?*, 81 U Cin L Rev 1615, 1617 (2013) (explaining that the collection of unpaid real-property taxes involves, among other things, "liquidation of the property by public sale in order to satisfy the debt owed").

[131] Plaintiffs' Supplemental Brief on Appeal (December 13, 2019) at 4 n 1, citing *United States v Miller*, 317 US 369, 373; 63 S Ct 276; 87 L Ed 336 (1943) (stating that just compensation for a takings claim requires that the property owner "be put in as good position pecuniarily as he would have occupied if his property had not been taken").

47

improperly taken was the surplus proceeds, not plaintiffs' real properties.[132]  Second,

plaintiffs are largely responsible for the loss of their properties' value by failing to pay their

taxes on time and in full.  If plaintiffs were entitled to collect more than the amount of the

surplus proceeds, not only would they be taking money away from the public as a whole,

but they would themselves benefit from their tax delinquency.[133]

Accordingly, when property is taken to satisfy an unpaid tax debt, just compensation

requires the foreclosing governmental unit to return any proceeds from the tax-foreclosure

sale in excess of the delinquent taxes, interest, penalties, and fees reasonably related to the

foreclosure and sale of the property—no more, no less.[134]

---

[132] This distinction also explains why the Michigan Takings Clause's 125% requirement does not apply.  That provision is triggered only when the property taken consists of an individual's principal residence.  That is not the case here.

[133] *In re State Hwy Comm'r*, 249 Mich 530, 535; 229 NW 500 (1930) ("Just compensation should neither enrich the individual at the expense of the public nor the public at the expense of the individual.").

[134] Plaintiffs suggest that they are entitled to the equity they held in their properties before foreclosure, but throughout their briefing they conflate equity with surplus proceeds, suggesting that they are one in the same.  See Plaintiffs' Brief on Appeal (February 13, 2019) at 12 ("Equity is realized when property is sold.  Thus, logically, common law and statutory law have traditionally treated the surplus proceeds from the sale of foreclosed property as representing the former owner's equity.").  Similarly, the concurring opinion asserts that the property right taken is the equity a former property owner held in his or her property prior to foreclosure.  The concurring opinion supports this assertion with scant caselaw, relying primarily on the "equity of redemption" as representing an owner's equity interest in property.  Yet the concurring opinion acknowledges that equity of redemption and equity are distinct concepts, with the former serving to protect the latter.  Further, we are unaware of any authority affirming a vested property right to equity held in property generally.  Nor is it necessary for us to do so here.  The question presented is whether a former property owner retains the ability to collect any surplus proceeds that might result after the government seizes title to real property for failure to pay taxes and then sells that property for more than the tax delinquency.  The earlier discussion reaffirms a former

48

## VI. CONCLUSION

We hold that plaintiffs, former property owners whose properties were foreclosed and sold to satisfy delinquent real-property taxes, have a cognizable, vested property right to the surplus proceeds resulting from the tax-foreclosure sale of their properties. This right continued to exist even after fee simple title to plaintiffs' properties vested with defendants, and therefore, defendants' retention and subsequent transfer of those proceeds into the county general fund amounted to a taking of plaintiffs' properties under Article 10, § 2 of our 1963 Constitution. Therefore, plaintiffs are entitled to just compensation, which in the context of a tax-foreclosure sale is commonly understood as the surplus proceeds. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the Oakland Circuit Court for proceedings consistent with this opinion.

Brian K. Zahra
Bridget M. McCormack
Stephen J. Markman
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

---

property owner's vested common-law property right to the surplus proceeds resulting from a tax-foreclosure sale that is protected by our state's Takings Clause. Thus, plaintiffs have a compensable takings claim for the surplus proceeds, i.e., the value of the property taken.

STATE OF MICHIGAN

SUPREME COURT

RAFAELI, LLC, and ANDRE
OHANESSIAN,

      Plaintiffs-Appellants,

v                                  No. 156849

OAKLAND COUNTY and ANDREW
MEISNER,

      Defendants-Appellees.

_____

VIVIANO, J. (*concurring*).

At issue is whether defendant Oakland County's retention of the surplus proceeds

from tax-foreclosure sales constitutes a taking under Article 10, § 2 of the 1963 Michigan

Constitution. I concur with the majority's result but disagree with much of its reasoning.[1]

In its zeal to adopt a pragmatic rule in order to provide limited relief to these plaintiffs and

others similarly situated, the majority has made a number of doctrinal missteps. In

particular, the majority has applied a flawed interpretive methodology and, even more

fundamentally, has failed to identify the correct property right. These mistakes are not

without consequences. The first trenches upon the Legislature's power to abrogate

nonvested property rights. And the second—by defining plaintiffs' property right as the

right to surplus proceeds, instead of the right to equity more generally—would seemingly

---

[1] I concur in all parts except Parts IV(C), V(A), V(C), and VI.

encourage and endorse many takings of a person's equity without just compensation whenever a foreclosure sale does not yield surplus proceeds.

I would instead interpret the Constitution in the usual manner, discerning the ordinary meaning of "property" and applying it to the facts here. Doing so, I conclude that the property right that has been taken from the plaintiffs is their equity in their respective properties and not any independent interest in the surplus proceeds from the tax-foreclosure sale.

## I. INTERPRETIVE ISSUES

The majority correctly notes that "a claimant must first establish a vested property right under state law" in order to have a takings claim and that " 'the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law.' "[2] Then the majority recounts the familiar rule that "[o]ur 'primary objective' in interpreting a constitutional provision such as our state's Takings Clause is 'to determine the text's original meaning to the ratifiers, the people, at the time of ratification.' "[3]

However, the majority does not explain which words in the Takings Clause are in need of interpretation.[4] In fact, rather than go on to explain what the ratifiers would have

---

[2] *Phillips v Washington Legal Foundation*, 524 US 156, 164; 118 S Ct 1925; 141 L Ed 2d 174 (1998) (quotation marks and citation omitted).

[3] *Wayne Co v Hathcock*, 471 Mich 445, 468; 684 NW2d 765 (2004).

[4] The Takings Clause reads, in pertinent part: "Private property shall not be taken for public use without just compensation therefore being first made or secured in a manner prescribed by law." Const 1963, art 10, § 2.

understood any particular words in the Takings Clause to mean, the majority proceeds to recount historical claims for surplus and a menagerie of other past cases involving vested property rights more generally. Later, when considering whether the Legislature might have abrogated a common-law right to the surplus, the majority explains:

> It is clear that our 1963 Constitution protects a former owner's property right to collect the surplus proceeds following a tax-foreclosure sale under Article 10, § 2. This right existed at common law; was commonly understood to exist in the common law before the 1963 ratification of our Constitution; and continues to exist after 1963, as our decision in *Dean* demonstrates. Because this common-law property right is constitutionally protected by our state's Takings Clause, the Legislature's amendments of the [General Property Tax Act (GPTA), MCL 211.1 *et seq*.] could not abrogate it. While the Legislature is typically free to abrogate the common law, it is powerless to override a right protected by Michigan's Takings Clause.[5]

Though the majority does not make it explicit, I understand its opinion as reasoning that because various past cases and other materials appear to recognize some interest on the part of the previous landowner in the surplus proceeds after a tax foreclosure, the ratifiers would have understood the term "property" in the Constitution to encompass such a property right to surplus proceeds. Consequently, that property right must be considered frozen and inviolable under our Takings Clause. And because it is enshrined in the Constitution, the Legislature may not abrogate that common-law right; to do so would run afoul of the Takings Clause.

I, of course, take no issue with the general rule that when interpreting a constitutional provision, we aim to "determine the text's original meaning to the

---

[5] *Ante* at 38.

3

ratifiers . . . ."[6]   Consequently, under our rules of constitutional interpretation, the definition of "property" is determined by what the ratifiers understood "property" to mean. But the majority's investigation of this concept ultimately rests on a flawed understanding of original meaning.   Obviously, the majority cannot say that the constitutional term "property" *means* "surplus proceeds."[7]   Rather, what the majority says, at least implicitly, is that the phrase "surplus proceeds" falls within the meaning of "property" because the ratifiers would have considered surplus proceeds to be property at the time of ratification. But the majority never defines the term "property."   Yet, this question—the semantic content of "property"—should be at the center of any interpretation of a legal term or phrase, and its absence here is telling.[8]   Compare this with how the United States Supreme Court has defined "property" in the Takings Clause: "The constitutional provision is addressed to every sort of interest the citizen may possess."[9]   Whether right or wrong, this definition at least gives the term a meaning that can be applied.

---

[6] *Hathcock*, 471 Mich at 468.

[7] Cf. McGinnis & Rappaport, *Original Interpretive Principles as the Core of Originalism*, 24 Const Comment 371, 378 (2008) ("The original meaning of the words would not normally be defined by the expected applications, but instead by the meaning that people at the time would understand the words to have.").

[8] Cooley, Constitutional Limitations (5th ed), p 49 (explaining that the purpose of interpretation is to "find[] out the true sense of any form of words").

[9] *United States v Gen Motors Corp*, 323 US 373, 378; 65 S Ct 357; 89 L Ed 311 (1945).

By contrast, the majority here focuses on what res the ratifiers would have believed were encompassed by the term "property."[10]  This treats the ratifiers' expectations about the application of the constitutional text as binding.  Such an approach has been rejected by those who, like myself, consider courts to be bound by the Constitution's original textual meaning—it is the publicly accessible meaning of the text, rather than its intended or expected applications, that binds the courts.[11]

---

[10] "Res" is Latin for "thing; event, business; fact; cause; property[.]"  University of Notre Dame, *William Whitaker's Words* <http://archives.nd.edu/cgi-bin/wordz.pl?keyword=res> (accessed June 26, 2020) [https://perma.cc/5HEJ-RHSD].  *Black's Law Dictionary* (11th ed) now defines it as "*n*. [Latin 'thing'] (17c) **1.** An object, interest, or status, as opposed to a person . . . ."

[11] See McConnell, *The Importance of Humility in Judicial Review: A Comment on Ronald Dworkin's "Moral Reading" of the Constitution*, 65 Fordham L Rev 1269, 1284 (1997) ("Mainstream originalists recognize that the Framers' analysis of particular applications could be wrong, or that circumstances could have changed and made them wrong. . . . [T]hey believe that '[w]e are governed by what our lawmakers said—by the principles they laid down—not by any information we might have about how they themselves would have interpreted those principles or applied them in concrete cases.' ") (citation omitted); Balkin, *Living Originalism* (Cambridge: The Belknap Press of Harvard University Press, 2011), p 13 ("Fidelity to original meaning as original semantic content does not require that we must apply [for example] the equal protection clause the same way that people at the time of enactment would have expected it would be applied."); Whittington, *Constitutional Interpretation: Textual Meaning, Original Intent, and Judicial Review* (Lawrence: University Press of Kansas, 1999), p 178 ("An expectation, in and of itself, is derived from the text and as a prediction about its effects in the future is only contingently related to the text. . . .  [T]he author has no special authority relative to expectations about effects."); Scalia, *A Matter of Interpretation: Federal Courts and the Law* (Princeton: Princeton University Press, 1997), p 144 ("I agree with the distinction . . . between . . . 'semantic intention' and the concrete expectations of lawgivers.  It is indeed the former rather than the latter that I follow."); Rosenthal, *Originalism in Practice*, 87 Ind L J 1183, 1209 (2012) ("Most originalists draw a distinction between the original meaning of constitutional text and its originally intended applications, arguing that only the former is interpretively binding.") (collecting sources); Barnett, *An Originalism for Nonoriginalists*, 45 Loy L Rev 611, 622 (1999) ("While some

---

The ratifiers' understanding thus establishes the general meaning of "property" but not necessarily which things fall within that concept. In other words, the meaning of "property," as defined at the time of ratification, establishes the parameters by which we

originalists still search for how the relevant generation of ratifiers expected or intended their textual handiwork would be applied to specific cases, original meaning originalists need not concern themselves with this, except as circumstantial evidence of what the more technical words and phrases in the text might have meant to a reasonable listener.").

The majority's emphasis on expected applications rather than the semantic content of the text itself fundamentally misperceives the object of interpretation as the ratifiers' intentions rather than the original public meaning of the text. As Robert Bork described the larger interpretive principle, the search for the "understanding of the ratifiers . . . is actually a shorthand formulation" for what courts must interpret "because what the ratifiers understood themselves to be enacting must be taken to be what the public of that time would have understood the words to mean. It is important to be clear about this. The search is not for a subjective intention." Bork, *The Tempting of America: The Political Seduction of the Law* (New York: Simon & Schuster Inc, 1990), p 144. See also Calabresi & Fine, *Two Cheers for Professor Balkin's Originalism*, 103 Nw U L Rev 663, 669 (2009) ("What judges must be faithful to is the enacted law, not the expectations of the parties who wrote the law. . . . The enactment into law of these texts was an open democratic process, and every citizen was entitled to think that the words in the texts that were enacted meant what a good dictionary in use at the time said they meant.").

Contemporaneous expectations about how the constitutional text applied in a case are useful only to the extent they shed light on the original public meaning. Whittington, *Originalism: A Critical Introduction*, 82 Fordham L Rev 375, 385 (2013) ("[E]xpected applications might be helpful to later interpreters in clarifying the substantive content of the embodied constitutional rule. The Founders could be mistaken or disingenuous about the implications of adopting a proposed rule, but the rule itself must be publicly understandable. If examples of likely applications of the rule are regularly offered and there is widespread agreement on such applications, then they may be reflective of the content of the rule in question."); *Original Interpretive Principles*, 24 Const Comment at 378 (noting that expected applications are not tantamount to original meaning but can provide evidence of that meaning).

determine the things denoted by "property."[12]  It does not necessarily establish, for all time, what those things were.[13]  This is particularly the case with a broad concept like property, which covers various classes of things that can be redefined by the Legislature.[14]

For these reasons, the ratifiers' understanding of which particular res were included in the definition of property at a particular moment in time does not dictate which res we must recognize as "property" under the Takings Clause today.  Instead, I would define the term "property" according to its ordinary meaning at the time the Constitution was ratified.  Because this case does not turn on fine distinctions in the definitions—but it does turn on

---

[12] See Slocum, *Ordinary Meaning: A Theory of the Most Fundamental Principle of Legal Interpretation* (Chicago: University of Chicago Press, 2015), p 222.

[13] Justice Thomas Cooley recognized, for example, that the same text bearing the same meaning could, over time, come to take on a different significance because changing circumstances (e.g., technology) could change the objects that fell within the unchanged textual meaning: "The bounds of [constitutional] power remain the same, but the new creations that come within its compass give it an importance which those who devised it never dreamed of."  Cooley, *The Comparative Merits of Written and Prescriptive Constitutions*, 2 Harv L Rev 341, 355 (1889); see also *Dist of Columbia v Heller*, 554 US 570, 582; 128 S Ct 2738; 171 L Ed 2d 637 (2008) ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment.  We do not interpret constitutional rights that way.  Just as the First Amendment protects modern forms of communications, . . . and the Fourth Amendment applies to modern forms of search, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 86 ("The meaning of rules is constant.  Only their application to new situations presents a novelty. . . .  Broad language can encompass the onward march of science and technology[.]").

[14] See *Black's Law Dictionary* (11th ed) (defining "property" as, "[c]ollectively, the rights in a valued resource such as land, chattel, or an intangible" or "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised").

having *some* definition rather than a mere example—it is sufficient for present purposes to employ a common definition of "property" from the relevant period: "something owned or possessed; *specif* : a piece of real estate"; "the exclusive right to possess, enjoy, and dispose of a thing : OWNERSHIP"; "something to which a person has a legal title."[15]

Defining property using this traditional approach to constitutional interpretation avoids other problems raised by the majority's reading. One such problem is that any property rights extant when the Constitution was ratified would be insulated from legislative change, whereas later-developed property rights would presumably be subject to change. Though the majority might conclude that the Legislature could expand the res in which citizens may have property interests, the majority's broad position would not allow the Legislature to repeal rights in the res that were recognized property rights at the time of ratification and thereby preserved in the protective amber of the Takings Clause.[16] That is not problematic if the rights the Legislature sought to abrogate were vested. The troubling sweep of the majority's opinion, however, would extend its prohibition even to

---

[15] *Webster's Seventh New Collegiate Dictionary* (1963); see also *The American Heritage Dictionary of the English Language* (1969) ("**1**. Ownership. **2**. A possession, or possessions collectively. **3**. Something tangible or intangible to which its owner has legal title."); 8 *Oxford English Dictionary* (1933) ("That which one owns; a thing or things belonging to or owned by some person or persons; . . . [a] piece of land owned[.]").

[16] Cf. *PruneYard Shopping Ctr v Robins*, 447 US 74, 93; 100 S Ct 2035; 64 L Ed 2d 741 (1980) (Marshall, J., concurring) ("Such an approach would freeze the common law as it has been constructed by the courts, perhaps at its 19th-century state of development. It would allow no room for change in response to changes in circumstance.").

legislation that prospectively modified or abrogated nonvested property rights—i.e., rights to property that individuals might acquire in the future.[17]

---

[17] The breadth of the opinion stems, in part, from the majority's misunderstanding about what it means for a right to be "vested." The majority suggests that the right to surplus proceeds is "vested" because "the right to collect these proceeds was beyond a mere expectancy or claim of entitlement," apparently because the proceeds can be owned. *Ante* at 35-36. In other words, the right is somehow vested irrespective of any individual circumstances—it is vested in the ether. But that is not how it works. "To constitute a vested right, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property . . . ." *In re Certified Question*, 447 Mich 765, 788; 527 NW2d 468 (1994) (quotation marks and citation omitted). "Vested" means "[h]aving become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute . . . ." *Black's Law Dictionary* (11th ed). This requires a real person or entity and a real property right, not simply a property right in the abstract. See *Wylie v City Comm of Grand Rapids*, 293 Mich 571, 586; 292 NW 668 (1940) (noting, in the related context of due process, that " '[r]ights are "vested" when the right of enjoyment, present or prospective, has become the property of some particular person or persons as a present interest' ") (citation omitted); Cooley, Constitutional Limitations, p 438 (describing vested rights in the context of an individual's rights and interests); 5 Smith & Philbin, Michigan Civil Jurisprudence, Constitutional Law (May 2020 update), § 300 (noting this definition).

For instance, I do not have a vested property right in a wild fox simply because, if I captured one, the law would recognize my ownership of it. Cf. *Pierson v Post*, 3 Cai R 175; 2 Am Dec 264 (1805). If, before I even don my hunting cap, the Legislature proscribes or limits ownership of foxes, no one would say I have been deprived of a vested property right in the fox I never owned or caught. At best, I had an expectation or hope. In the same way, someone who does not now own a home but would like to own one in the future does not have any vested property right in a home. As Justice Cooley stated, "[A] mere expectation of property in the future is not considered a vested right . . . ." Cooley, Constitutional Limitations, p 440. And as discussed below, there is no vested right in a mere common-law rule. See *post* at nn 20-21 and accompanying text. Thus, although the majority purports to cabin its opinion to vested rights, its misconception of those rights leads to a wider application that encompasses nonvested rights as well.

9

This would be a novel approach to legislative power over property. We have stated, for example, that the right of redemption—which we have recognized is a property right in the context of tax-foreclosure sales[18]—"is not a constitutional right but exists only as permitted by statute, that such rights . . . are subject to abridgement by the legislature for the reason they are remedial in nature, and that no vested rights arise . . . ."[19] Other courts, too, have recognized that the Legislature's role in defining property rights extends to removing items from the category of property, if done prospectively, i.e., without affecting

---

[18] See *Cobleigh v State Land Office Bd*, 305 Mich 434, 436-437; 9 NW2d 665 (1943).

[19] *Buckeye Union Fire Ins Co v Michigan*, 383 Mich 630, 639; 178 NW2d 476 (1970) (discussing *Baker v State Land Office Bd*, 294 Mich 587; 293 NW 763 (1940)); see also *Dumphey v Hilton*, 121 Mich 315, 317; 80 NW 1 (1899) ("It was held by the United States Supreme Court that the right of redemption from tax sales, although it is to be regarded favorably, does not exist, except as permitted by statute. . . . 'While it may well be doubted whether the legislature could enact an immediate bar to any existing right, yet it is clearly settled that to prescribe the period within which any right may be enforced is within their power.' ") (citations omitted). We had earlier said that "the equity of redemption"—which was the redemption right at common law—"appertains to and goes with the title to the real estate, and is in law the property of the owner of the fee. It is an interest in land . . . ." *Case v Ranney*, 174 Mich 673, 681; 140 NW 943 (1913).

vested rights.[20] And, of course, even the majority recognizes that the Legislature may, at times, abrogate the common law.[21] As the United States Supreme Court has explained:

> A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances.[22]

A vested right, therefore, cannot be divested without just compensation.[23] But the Legislature has greater scope to prospectively reshape laws establishing property rights as

---

[20] The New York Court of Appeals held, for example, that the legislature could "extinguish [a] property right by the simple expedient of repealing the provision which gives rise to it," but only prospectively and not as to property already vested. *Alliance of American Insurers v Chu*, 77 NY2d 573, 585-586; 571 NE2d 672 (1991); *id*. at 589 ("Nothing in our decision prevents the State from changing the law as it affects future contributions."); 29A CJS, Eminent Domain (June 2020 update), § 72 ("It has also been held that, just as a state legislature has the power to statutorily create property interests, so too may it legislatively alter or take away those same property interests, though its power to alter the rights and obligations that attach to completed transactions is not as broad as its power to regulate future transactions."). It is true that these sources refer to statutorily created property rights rather than those that arose from the common law. But this distinction is immaterial because, as explained below, the Legislature can abrogate the common law.

[21] Const 1963, art 3, § 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.").

[22] *Munn v Illinois*, 94 US 113, 134; 24 L Ed 77 (1876) (discussing due process).

[23] Cf. *Bank Markazi v Peterson*, 578 US ___, ___; 136 S Ct 1310, 1324; 194 L Ed 2d 463 (2016) ("The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.' ") (quotation marks and citation omitted); *In re Certified Question*, 447 Mich at 787-788 ("One who asserts an

11

long as those laws function in a way that leaves vested rights untouched.[24]  Such actions

are not prohibited by the Takings Clause.[25]  Thus, for example, the United States Supreme

Court has held that the expectation of future child-support benefits is not protected because

it is a "prospective right . . . clearly subject to modification by law, be it through judicial

decree, state legislation, or congressional enactment."[26]

Moreover, as the United States Supreme Court and numerous state supreme courts

have established, "the existence of a property interest is determined by reference to existing

rules or understandings that stem from an independent source *such as state law*."[27]  In other

---

uncompensated taking claim must first establish that a *vested* property right is affected.")
(emphasis added).

[24] See Cooley, Constitutional Limitations, p 440 ("Acts of the legislature . . . cannot be
regarded as opposed to fundamental axioms of legislation, 'unless they impair rights which
are vested; because most civil rights are derived from public laws; and if, before the rights
become vested in particular individuals, the convenience of the State procures amendments
or repeals of those laws, those individuals have no cause of complaint.' ") (citation
omitted).

[25] There is no need to decide in this case whether other constitutional provisions may limit
the Legislature's ability to define property.  My point is only that no such limitation may
be found in the Takings Clause.

[26] *Bowen v Gilliard*, 483 US 587, 607; 107 S Ct 3008; 97 L Ed 2d 485 (1987); see also
Peterson, *The Taking Clause: In Search of Underlying Principles Part I—A Critique of
Current Takings Clause Doctrine*, 77 Calif L Rev 1299, 1313 (1989) ("In a number of other
takings cases, the Court has said that unless a right created by positive law is a 'vested
right,' it is not property within the meaning of the takings clause.  The Court's reasoning
is that when the government grants A a legal right, it normally retains the power to change
the law to promote the general welfare, and thus no taking occurs when the government
exercises its retained power, even though the change in the law eliminates A's rights under
the prior law.  As the Court expresses it, A has not lost any 'vested rights.' ").

[27] *Phillips*, 524 US at 164 (quotation marks and citation omitted; emphasis added).

words, "the Constitution protects rather than creates property interests . . . ."[28] Citing this rule, one federal court has reasoned that the nature of the "property" at issue in the tax-foreclosure context would be found in local law, not the Constitution itself.[29] Yet by reasoning that "property" must be defined at least as the particular types the ratifiers had in mind, the majority interprets the Takings Clause as exalting those interests above the Legislature's authority to modify them.[30]

---

[28] *Id*. See also *Kafka v Montana Dep't of Fish, Wildlife & Parks*, 348 Mont 80, 93; 2008 MT 460; 201 P3d 8 (2008) ("Property interests themselves are not defined by the [federal] Takings Clause, or for that matter by [the state's taking clause]" but by " ' "background principles" and "rules and understandings" [that] focus on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of the property.' ") (citations omitted); *Cheatham v Pohle*, 789 NE2d 467, 473 (Ind, 2003) ("The plaintiff has no property to be taken except to the extent state law creates a property right."); *Mayor & City Council of Baltimore v Bregenzer*, 125 Md 78; 93 A 425, 426 (1915) ("The section of the Constitution quoted does not define property, nor does it declare what shall be a taking. It leaves those questions to the determination of the courts upon the facts of each particular case.").

[29] *Coleman v Dist of Columbia*, 70 F Supp 3d 58, 80 (D DC, 2014).

[30] This result goes well beyond what the United States Supreme Court has done. Even with regard to vested property rights, the United States Supreme Court has recognized that "the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; '[a]s long recognized, some values are enjoyed under an implied limitation and must yield to the police power.' " *Lucas v South Carolina Coastal Council*, 505 US 1003, 1027; 112 S Ct 2886; 120 L Ed 2d 798 (1992), quoting *Pennsylvania Coal Co v Mahon*, 260 US 393, 413; 43 S Ct 158; 67 L Ed 322 (1922). "And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Lucas*, 505 US at 1027-1028. Elaborating on these points in his *Lucas* dissent, Justice Stevens observed that "[a]rresting the development of the common law" would be "a departure from our prior decisions[.]" *Id*. at 1069 (Stevens, J., dissenting). Legislatures, he explained, "often revise the definition of

13

I believe that such a reading raises serious concerns regarding the separation of powers. The Constitution provides that "the legislative power of the State of Michigan is vested in a senate and a house of representatives."[31] This Court has recognized that the legislative power includes the power to abrogate the common law.[32] In fact, the Constitution specifically allows the common law to be changed: Const 1963, art 3, § 7 states, "The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, *or are changed*, amended or repealed."[33] It is true that this Court has applied the principle that statutes in derogation of the common law must be strictly construed.[34] But the majority now significantly limits that power by reasoning that any attempt to prospectively abrogate

---

property and the rights of property owners. Thus, when the Nation came to understand that slavery was morally wrong and mandated the emancipation of all slaves, it, in effect, redefined 'property.' " *Id*. All of this—in both the majority and dissent—referred to the legislature's expansive power over property a person already owned. In this case, the majority goes in the opposite direction and ties the Legislature's hands in regulating property that does not yet exist and that *no one* yet owns.

[31] Const 1963, art 4, § 1.

[32] E.g., *Hoerstman Gen Contracting, Inc v Hahn*, 474 Mich 66, 74; 711 NW2d 340 (2006) ("The Legislature has the authority to abrogate the common law.").

[33] Emphasis added.

[34] E.g., *Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502, 508; 309 NW2d 163 (1981) ("[S]tatutes in derogation of the common law must be strictly construed . . . .").

a common-law property right in a particular object that existed in 1963, without providing just compensation, is unconstitutional.[35]

## II. THE PROPERTY RIGHT AT ISSUE

The majority's flawed interpretive methodology has led it to characterize the "property" at issue as merely the surplus proceeds from the foreclosure sale. But the existence and scope of these proceeds are contingent upon the foreclosure sale—the proceeds spring to life only at the end of that process. The majority does not consider the property interests that exist before the sale or how these interests affect the taxpayer's entitlement to anything resulting from the sale. In starting its analysis at the end of the process, the majority ignores the laws and history of real-property ownership and creates problematic gaps in the process that fail to respect takings law. My analysis, by contrast, starts at the beginning: the property owners' preexisting interest in the real estate, or their equity.

---

[35] Additionally, I believe that the majority's approach has broad implications in the realm of regulatory takings. If the ratifiers' understanding of which particular objects an individual may have property rights in is now set in stone in the Constitution, I see no reason why the ratifiers' understanding of the scope of their property rights is also not set in stone. In other words, under the majority's approach, if the ratifiers believed that their property interest entitled them to use a res in a variety of ways, each of those ways must be read into the definition of "property" under the Takings Clause. Consequently, it would be unconstitutional for a regulation to take away any use of a res that the ratifiers would have understood their property rights to include.

15

## A.  THE MAJORITY'S MISTAKEN APPROACH

It is important, at the outset, to note the questionable basis for the majority's conclusion that "our state's common law recognizes a former property owner's property right to collect the surplus proceeds . . . ."  The majority relies, first, on the Magna Carta, saying, "Just as the Magna Carta protected property owners from uncompensated takings, it also recognized that tax collectors could only seize property to satisfy the value of the debt payable to the Crown, leaving the property owner with the excess."[36]  But the provision of the Magna Carta to which the majority refers concerns collecting debts by seizing only movable property.[37]  It is much more understandable to have a rule discouraging the government from needlessly taking property in excess of the tax debt when the government is seizing various movable goods rather than real estate—it is easier to take the chair and leave the table than it is to take the kitchen and leave the living room.  Thus, although many of our rights can be traced to the Magna Carta, I question whether

---

[36] *Ante* at 35.

[37] *Ante* at 28.  Clause 26 of the Magna Carta reads:

> If at the death of a man who holds a lay 'fee' of the Crown, a sheriff or royal official produces royal letters patent of summons for a debt due to the Crown, *it shall be lawful for them to seize and list movable goods* found in the lay 'fee' of the dead man to the value of the debt, as assessed by worthy men.  Nothing shall be removed until the whole debt is paid, when the residue shall be given over to the executors to carry out the dead man's will.  If no debt is due to the Crown, all the movable goods shall be regarded as the property of the dead man, except the reasonable shares of his wife and children. [Johnson, *The Ancient Magna Carta and the Modern Rule of Law: 1215 to 2015*, 47 St Mary's L J 1, 47 (2015) (emphasis added).]

Clause 26 has much bearing on the seizure of real property.[38]  Additionally, it is not quite true that tax collectors could only seize property to satisfy the debt—as "the value of the goods seized had to approximate the value of the debt[.]"[39]  Such a rule falls short of one that demands any surplus be returned to the previous owner.

Next, the majority turns to *People ex rel Seaman v Hammond*, 1 Doug 276 (Mich, 1844), noting that though *Seaman* held that the previous landowner was entitled to the surplus, the statutory scheme at the time was different than the GPTA.  Specifically, the statute specified that the excess proceeds must be returned to the owner.[40]  The majority appears to recognize that *Seaman*, and other cases involving statutes, are not particularly instructive.[41]  Nevertheless, the majority concludes that "a fair reading of *Seaman*

---

[38] See Baker, *An Introduction to English Legal History* (Dayton: LexisNexis, 2002), p 223 ("The most fundamental distinction in the English law of property was between real property (realty) and personal property (personalty).").  Indeed, the conception of ownership of land—real property—was only just emerging in the thirteenth century from innovations within the feudal system.  *Id*. at 223-237; see also Turner, *The Equity of Redemption: Its Nature, History and Connection with Equitable Estates Generally* (Cambridge: Cambridge University Press, 1931), pp 1-3.  The majority's resort to Blackstone is similarly unavailing because Blackstone's discussion of bailments deals with *goods* rather than real property.  See *ante* at 28-29, citing 2 Blackstone, Commentaries on the Laws of England, p *452.

[39] *Ancient Magna Carta*, 47 St Mary's L J at 47.

[40] *Seaman*, 1 Doug at 278.

[41] The majority also cites *United States v Lawton*, 110 US 146; 3 S Ct 545; 28 L Ed 100 (1884), and *Nelson v City of New York*, 352 US 103; 77 S Ct 195; 1 L Ed 2d 171 (1956).  See *ante* at 25 ("Significantly, *Seaman*, *Lawton*, and *Nelson* all address a former property owner's *statutory* right to recover the surplus proceeds.").  See also *ante* at 25-26 ("*Lawton* and *Nelson* establish that the Takings Clause under the United States Constitution may afford former property owners a remedy when a tax-sale statute provides the divested

demonstrates that in the early years of this state, it was commonly understood that the delinquent taxpayer, not the foreclosing entity, continued to own the land at the time of the tax-foreclosure sale and would have been entitled to any surplus, which no more followed title to the land than the former owner's other personal property."[42] But this is a misreading of *Seaman*. To the extent that the owner's entitlement to the surplus was "commonly understood," it no doubt resulted from the statute that expressly provided such a right. If the majority means this common understanding somehow reflected a common-law right to the surplus, I do not see how. It is just as possible that the statutory scheme provided for a right in the surplus because the Legislature did not believe the common law recognized such a right. Speculations on what the Legislature thought it was doing are thus unfruitful and far afield from establishing a common-law right to the proceeds. In sum, it is far from clear what implications the former existence of a statutory right to surplus proceeds has in determining the application of the constitutional right in this case.

And *Dean v Dep't of Natural Resources*, 399 Mich 84; 247 NW2d 876 (1976), can hardly be read as recognizing a longstanding vested property right in the surplus. That case considered an unjust-enrichment claim. The key determination in that cause of action is whether retention of the benefit is inequitable, not which party has the property right.[43] In

---

property owner an interest in the surplus proceeds and the government does not honor that statutory interest.").

[42] *Ante* at 30.

[43] See also *Tkachik v Mandeville*, 487 Mich 38, 47-48; 790 NW2d 260 (2010) ("Unjust enrichment is defined as the unjust retention of ' "money or benefits which in justice and

18

other words, *Dean* involved an equitable decision based on the specific facts of the case. Those facts, which involved "the alleged good-faith attempt at redemption, the running of the redemption period after this attempt with plaintiff under the impression that she had in fact redeemed her home, the loss of her home, and the sale of the property by the State for a profit of close to $10,000," are very different than those here.[44] *Dean* does not indicate that all former property owners have a property right to the surplus as a matter of course.[45]

## B. EQUITY

In contrast to the majority's approach, I would turn to the law of property and the development of property interests in real estate to determine the rights at issue. The history of equity in real estate is particularly illuminating because this property right formed in response to foreclosure practices that raised concerns like those in the present case. Until mortgages came into widespread use, creditors generally obtained a "gage of land" as security in the debtor's land, but the creditor could not recover possession of the land from

---

equity belong to another." ' "), quoting *McCreary v Shields*, 333 Mich 290, 294; 52 NW2d 853 (1952) (citation omitted).

[44] *Dean v Dep't of Natural Resources*, 399 Mich 84, 94-95; 247 NW2d 876 (1976).

[45] The majority also cites the brief discussion on surplus proceeds in Cooley, Law of Taxation (3d ed), p 952. See *ante* at 29. But Cooley never stated the right to surplus was of common-law origin. Instead, the treatise explained that "[v]arious methods are *adopted* in different states to save, *if possible*, something to the owner when his land is sold." Cooley, Law of Taxation, p 952 (emphasis added). As the majority notes, Cooley found support in *Lawton*, 110 US 146, but that is another case dealing with a statutory scheme rather than the common law. See *ante* at 29 n 86.

19

the debtor.[46] That defect, from the creditor's perspective, likely led to the creation of the predominant form of common-law mortgage, in which the mortgagor conveyed the land, usually in fee simple, to the mortgagee on the condition subsequent that it would be reconveyed to the mortgagor when the debt was repaid at the appointed time.[47]

The harshness of this procedure was evident to many at the time and is similar to harshness involved in the present case, namely that it automatically led to the full loss of

---

[46] Sutherland, *The Assize of Novel Disseisin* (Oxford: Clarendon Press, 1973), pp 12, 138; see also Hazeltine, *General Preface*, in Turner, *The Equity of Redemption*, pp xxiv-xxx (describing the gage as a conveyance on condition precedent); 3 Holdsworth, A History of English Law (3d ed), pp 128-129 (calling the interest a mortgage but differentiating it from later practices and explaining that the creditor could not dispossess the debtor if the latter had possession).

[47] See *An Introduction to English Legal History*, pp 311-312 ("[T]he mortgagor conveyed the fee to the mortgagee forthwith, on condition that he might re-enter (and regain the fee) if he paid by a certain date. . . .  [This] gave the mortgagee a fee simple defeasible by condition subsequent (that is, payment)."); Simpson, *An Introduction to the History of the Land Law* (London: Oxford University Press, 1961), p 225 ("[T]he mortgagor conveyed his lands outright in fee simple to the mortgagee, with a covenant for re-conveyance if the debt was repaid on time; this is the classical common law mortgage . . . ."); 3 Holdsworth, p 129 ("It was probably due chiefly to the latter cause [i.e., the creditor's inability to recover the land from a debtor in possession] that the peculiar interest of the mortgagee . . . disappeared.  He ceased to take a peculiar interest as mortgagee, and took instead some one of the recognized estates or interests in the land—a fee simple, a life estate, or a term. . . .  The debtor might convey the land to the creditor in fee, with a proviso that if the debt was paid by a fixed date the land should be reconveyed[.]"); Turner, *The English Mortgage of Land as a Security*, 20 Va L Rev 729, 729 (1934) ("The English mortgage has developed from a form of conveyance in use in the 16th century comprising an absolute conveyance to the lender with a proviso that, on the borrower repaying the principal with interest and costs by a fixed day, the lender would reconvey the property to him."); Lloyd, *Mortgages—The Genesis of the Lien Theory*, 32 Yale L J 233, 234 (1923) ("If the debt was not paid on the day named, the estate of the creditor became absolute. After default no right of redemption was admitted.").

the mortgagor's interest in the property no matter how much debt was owed—no surplus

was owed or paid to the mortgagor.[48]   Equity courts addressed these concerns—in part

---

[48] See Restatement Property, 3d, Mortgages, § 3.1, comment *a* ("The consequences of payment default were especially harsh on the mortgagor.  If for any reason the payment was not made on law day, the borrower forfeited all interest in [the property]."); 5 Tiffany, Real Property (3d ed, November 2019 update), § 1518 (noting that equity intervened out of justice because "no foreclosure was necessary [under the common-law mortgage], since the mere breach of the condition vested an absolute estate in the mortgagee"); *An Introduction to English Legal History*, p 313 (explaining that equity courts began granting relief in this situation because "[t]he moneylender was morally entitled only to the debt, and perhaps some reasonable profit, but ought not to profit unconscionably from a penal arrangement"); *An Introduction to the History of the Land Law*, pp 226-227 ("The common law courts construed mortgage transactions strictly and unsympathetically.  If the mortgage provided that the mortgagor was to lose his land through defaulting in payment upon a fixed day then that was that; it mattered nothing that he defaulted by a single day, or that the property was worth infinitely more than the debt."); 5 Holdsworth, *A History of English Law* (1924), pp 330-331 (noting that equity granted relief because of the penal character of the forfeiture); Sugarman & Warrington, *Land Law, Citizenship, and the Invention of "Englishness": The Strange World of the Equity of Redemption*, in *Early Modern Conceptions of Property* (Brewer & Staves eds, 1995), p 113 ("A single day's delay in tendering repayment could result in the borrower losing the entire property to the lender, even though the amount of the loan might be far less than the value of the land."); Burkhart, *Fixing Foreclosure*, 36 Yale L & Pol'y Rev 315, 320 (2018) (noting that this "process," as incorporated in the American colonies, "often gave lenders an especially large windfall because land values were increasing at a greater rate than had previously occurred anywhere"); Weinberger, *Tools of Ignorance: An Appraisal of Deficiency Judgments*, 72 Wash & Lee L Rev 829, 849-850 (2015) (noting that the borrower was not entitled to any surplus and lost title and all interest in the property); Mattingly, *The Shift From Power to Process: A Functional Approach to Foreclosure Law*, 80 Marq L Rev 77, 90 (1996) ("The pendulum of power swung towards the borrower with the intervention of the Equity Courts, which viewed the borrower's forfeiture of any interest in the property as unduly harsh."); Wechsler, *Through the Looking Glass: Foreclosure by Sale as* De Facto *Strict Foreclosure—An Empirical Study of Mortgage Foreclosure and Subsequent Resale*, 70 Cornell L Rev 850, 856 (1985) ("Equity soon recognized the injustice of the forfeiture inherent in this situation.").

The same points are true regarding strict foreclosures, which developed along with the changes in mortgage law described above and, as in the present case, transfers title by

because the transaction functioned as an extension of a security interest in the property rather than a true transfer of the fee—by creating the "equity of redemption," under which the mortgagor could redeem the property by paying off the debt after defaulting.[49] The

court decree rather than automatically by extinguishment of the condition subsequent or by foreclosure sale. In strict foreclosure, as under the common-law mortgage or the statutes at issue here, the homeowner loses his or her equity in the property. Ghent, *How Do Case Law and Statute Differ? Lessons from the Evolution of Mortgage Law*, 57 J L & Econ 1085, 1094 (2014) ("Strict foreclosure involved the lender going to an equity court and asking it to terminate the borrower's equity of redemption; foreclosure by sale of the property was not permitted, and any equity the borrower had in the property would be lost in the foreclosure."); Tracht, *Renegotiation and Secured Credit: Explaining the Equity of Redemption*, 52 Vand L Rev 599, 607 (1999) ("Under strict foreclosure (where foreclosure vests title in the lender), there will be a forfeiture by the borrower and a windfall to the lender if the property is worth more than the debt."); Brabner-Smith, *Economic Aspects of the Deficiency Judgment*, 20 Va L Rev 719, 720-721 n 2 (1934) (Strict foreclosure "is a proceeding in which the decree finds that the mortgagee debt is due and has not been paid, that title to the property therefore is absolute in the mortgagee, and that the mortgagor is entirely divested of whatever interest he had in the premises at the time of the execution of the mortgage. There is no sale and no resulting deficiency or surplus.").

[49] See 1 Coote, A Treatise on the Law of Mortgages (2d ed), pp 19-20 ("[Equity courts] declared it unreasonable that [the mortgagee] should retain for his own benefit, what was intended as a mere pledge; and they adjudged that the breach of the condition was in the nature of a penalty, which ought to be relieved against, and that the mortgagor had an equity to redeem on payment of principal, interest, and costs . . . ."); Sugarman & Warrington, *Equity of Redemption*, p 113 ("Dating from at least the turn of the seventeenth century, the courts of equity determined that the strict date for repayment was somewhat irrelevant. Accordingly, the lender's claim to the property became subject 'to a right called the equity of redemption, which arose from the court's consideration that the real object of the transaction was the creation of a security for the debt. This entitled the [borrower] to redeem (or recover the property), even though he had failed to repay by the appointed time.' ") (citation omitted; brackets in original); Waddilove, *The "Mendacious" Common-Law Mortgage*, 107 Ky L J 425, 457 (2019) ("The equity of redemption . . . looked to what it deemed to be underlying substance of the mortgage agreement and gave effect to that over legal interpretation.").

The mortgagor's specific right to redeem property after foreclosure has been codified in Michigan, and the foreclosure sale purchaser's deed does not vest until the

"equity of redemption" was considered—including by this Court—a property right and came to represent the homeowner's interest in the property, known as "equity."[50]

---

redemption period ends.  See MCL 600.3240(1) and (2); MCL 600.3236.  See also *People v March*, 499 Mich 389, 416-421; 886 NW2d 396 (2016).

[50] As described in the Restatement Property, 3d, Mortgages, § 3.1, comment *a*, the "concept [of equitable redemption] evolved from simply a late payment rule to connote, in addition, the mortgagor's ownership interest in the land prior to the satisfaction of the mortgage. The term 'equity' became and is today the pervasively used term to describe this interest." See also *Case*, 174 Mich at 681 ("As a general proposition, the equity of redemption appertains to and goes with the title to the real estate, and is in law the property of the owner of the fee.  It is an interest in land . . . ."); *An Introduction to English Legal History*, p 314 ("The equity of redemption had thus become a right inherent in the land . . . .  [T]he great landowner of the seventeenth, eighteenth and nineteenth centuries was commonly in possession of his land (or some of it) only as the owner of an equity of redemption.  The equity could be bought and sold, settled in tail, and even mortgaged. . . .  [I]t had become an equitable estate[.]"); *An Introduction to the History of the Land Law*, pp 227-228 ("[T]he equity of redemption [was] a peculiar form of property which could be dealt with by the debtor like other forms of equitable property. . . .  In the eighteenth century the final touches were put upon the conception; the equity of redemption is spoken of as an estate in the land, and the mortgagor is regarded as the owner in equity of the land."); Turner, *The Equity of Redemption*, pp 66-67 (" 'An equity of redemption is considered as an estate in land[.] . . .  The person having the equity of redemption is considered as the owner of the land . . . .  An equity of redemption, . . . unforeclosed, is the ownership of the land, or the real estate in equity[.]' ")  (citation omitted); 6 Holdsworth, *A History of English Law* (1924), p 663 ("The result had been to make the mortgagor's equity to redeem a right of property.  He had an equitable estate in the land; and, subject to the legal rights of the mortgagee, was, in equity, regarded as its owner."); 5 Holdsworth, p 332 ("[I]t became clear that this equitable right to redeem was in substance an equitable estate in the land which could be conveyed or settled like any other estate."); Waddilove, *Why the Equity of Redemption?*, in *Land and Credit: Mortgages in the Medieval and Early Modern European Countryside* (Briggs & Zuiderduijn eds, 2018), § 5.1, pp 1-2 ("According to the equity of redemption, a mortgagor remained the true owner of mortgaged property throughout a mortgage despite lacking legal title; a mortgagee's interest was mere security for a debt; and a mortgagor was thus entitled to redeem the property at any time . . . until his or her equity of redemption was declared foreclosed by a court."); Sugarman & Warrington, *Equity of Redemption*, pp 115-116 (noting the "shift of the equity of redemption from a 'thing' to an 'estate' in equity, that is, in conceptualizing the equity of redemption as a kind

Thereafter, the equity courts "developed the decree of foreclosure," which a mortgagee could seek in order to end the mortgagor's period of equitable redemption; when foreclosure by sale was permitted, "the mortgagee [took] the money owed to her/him, the remainder going to the mortgagor."[51] Thus the creation of "equity" led to the homeowner's

---

of real property rather than as a kind of chattel property," and noting further that it was "characterized . . . as a title in equity" and "was proprietorial"); *Mortgages*, 32 Yale L J at 236 (noting that chancery "treats the equity of redemption not as a mere right but as an estate which the mortgagor may deal with in any way consistent with the rights of the mortgagee in his security").

Although the terms "equity" and "equity of redemption" now are "interchangeable," they were "not equivalent" at common law because the equity of redemption originally could not be sold. Sabella, *When Enough is Too Much: Overcollateralization as a Fraudulent Conveyance*, 9 Cardozo L Rev 773, 780 n 32 (1987). Once it could be alienated, "the concept changed in meaning to one much closer to today's notion of 'equity.'" *Id*. Still, a distinction exists. In discussing the mortgagor's interest in the property, one treatise states, "[T]he term 'equity of redemption' which had previously and appropriately been applied to the mortgagor's right to get back his property after default was applied somewhat inappropriately to this entirely distinct equitable ownership before default." 1 Nelson, Real Estate Finance Law (6th ed), § 1:3. Compare *Black's Law Dictionary* (11th ed) (defining "equity" as "[a]n ownership interest in property"), with *id*. (defining "equity of redemption" as "[t]he right of a mortgagor in default to recover property before a foreclosure sale by paying the principal, interest, and other costs that are due"). Thus, perhaps it is more accurate to say a redemption right functions to protect a homeowner's equity interest. See, e.g., Note, *The Big Chill: Applicability of Section 548(a)(2) of the Bankruptcy Code to Noncollusive Foreclosure Sales*, 53 Fordham L Rev 813, 817 n 22, 834 (1985) (observing that the equity interest was originally called the equity of redemption but noting that the "debtor can protect his equity interest in the property by paying the sale price plus costs," i.e., exercise the redemption right, and that the equity of redemption "ordinarily would serve to preserve his equity interest").

[51] Sugarman & Warrington, *Equity of Redemption*, pp 113-114; see also 2 Dunaway, Law of Distressed Real Estate (December 2019 update), § 26:29 (noting that any surplus over the foreclosing mortgagee's debt is paid to other liens and "[a]ny balance is distributed to the holder of the equity of redemption"); 5 Holdsworth, p 331 ("About the same period therefore we get the foreclosure decree . . . ."); *Fixing Foreclosure*, 36 Yale L & Pol'y Rev at 319-320 (discussing the transition from strict foreclosure to foreclosure by public

right to surplus proceeds from foreclosure sales.  Indeed, as stated in Restatement Property, 3d, Mortgages, § 7.4 , comment *a*, "[W]hen a surplus occurs, it represents what remains of the equity of redemption and is, as such, a substitute *res*.  The surplus stands in the place of the foreclosed real estate . . . ."[52]

---

auction); *How Do Case Law and Statute Differ*, 57 J L & Econ at 1094-1095 (discussing the transition from strict foreclosure to foreclosure by sale, which protected the debtor's equity); *Through the Looking Glass*, 70 Cornell L Rev at 859 ("Foreclosure by sale was viewed as a logical way of protecting the debtor's equity in the property . . . ."); *The English Mortgage*, p 730 ("Almost as soon as the equity of redemption became established the mortgagee was given an equitable right of foreclosure[.]").

[52] As the Missouri Court of Appeals stated:

> [A] foreclosure sale surplus "retains the character of real estate for the purpose of determining who is entitled to receive it, and goes to the person to whom the real estate would have gone but for the conversion." *Roy v. Roy*, 233 Ala. 440, 172 So. 253, 254 (1937).  Such surplus represents the owner's equity in the real estate. *Dodson v. Farm & Home Sav. Ass'n*, 208 Ga.App. 568, 430 S.E.2d 880, 881 (1993).  It stands in place of the foreclosed property, subject to the same liens and interests that were attached to the land. *Timm v. Dewsnup*, 86 P.3d 699, 703 (Utah 2003).  Surplus "usually arises because more land is sold . . . than is necessary to satisfy the mortgage debt. . . .   [T]he money stands for the land and the rights therein are determined as though the court were dealing with the land itself." *Morris v. Glaser*, 106 N.J. Eq. 585, 151 A. 766, 771 (N.J.Ch.1930) *aff'd mem.*, 110 N.J. Eq. 661, 160 A. 578 (N.J.Err. & App.1932). *See also First Fed. Sav. & Loan Ass'n v. Brown*, 78 A.D.2d 119, 434 N.Y.S.2d 306, 310 (1980) (foreclosure surplus "stands in place of the land for all purposes of distribution among persons having vested interests or liens upon the land"); *East Atlanta Bank v. Limbert*, 191 Ga. 486, 12 S.E.2d 865, 867 (1941) (quoting *Morris*)[.]   [*Grand Teton Mountain Investments, LLC v Beach Props, LLC*, 385 SW3d 499, 502-503 (Mo App, 2012).]

See also Nelson, § 7:32 ("The major underlying principle is that the surplus represents the remnant of the equity of redemption and the security that the foreclosure eliminated. Consequently, the surplus stands in the place of the foreclosed real estate . . . ."); Tiffany, § 1529 ("Any surplus proceeds of sale remaining after the payment of the debt secured by

Given this history and caselaw, I would characterize the property right at issue here as the taxpayer's equity in the property. This conclusion best fits the development of ownership rights in property laden with debts or liens. The majority's belief that a property right in the surplus proceeds exists apart from the interest in the equity finds no support in the historical record. Indeed, equity formed in response to practices like those at issue here, albeit in the private realm, and gives rise to any right in surplus proceeds. It thus constitutes a disposable property right to the value of land above any liens or other interests in the property.[53] And it is a vested right—at least with regard to an individual who owns

the mortgage are paid to the mortgagor or, if there are subsequent purchasers or incumbrancers, such surplus proceeds belong to them, in the order of priority in which their rights against the land could have been asserted. In other words, the proceeds of sale are substituted for the land itself, and become subject to outstanding liens and claims to the same extent and in the same order as the land itself was subject thereto.") (citations omitted); Nelson & Whitman, *Reforming Foreclosure: The Uniform Nonjudicial Foreclosure Act*, 53 Duke L J 1399, 1483 (2004) ("Sometimes a foreclosure sale yields a surplus amount in excess of what is needed to satisfy the mortgage obligation and the expenses of sale. In essence, when a surplus results, it represents what remains of the debtor's ownership or 'equity of redemption' and is conceptually a substitute res.").

It is true that some courts have found that the surplus proceeds are the property owner's general funds rather than the real estate. See *In re Schiphof*, 192 NC App 696, 702; 666 SE2d 497 (2008) ("This Court stated that, 'the surplus funds . . . did not constitute real estate. The surplus funds represented the general funds of the plaintiffs, the owners of the premises and the grantors in the deed of trust which was foreclosed.' "), quoting *Smith v Clerk of Superior Court*, 5 NC App 67, 73-74; 168 SE2d 1 (1969). This does not, however, have any bearing on a homeowner's entitlement to the proceeds by virtue of his or her equity in the home. As stated, " '[E]quity' is defined as 'the value of a property * * * above the total of the liens.' " *Crane*, 331 US at 7. Whether that value, realized in the surplus proceeds after a tax foreclosure, is thought of as representing the real estate or general funds, it is still a result of the right to equity.

[53] *Black's Law Dictionary* (11th ed) defines "equity" as "[a]n ownership interest in property, esp. in a business." See also *Crane*, 331 US at 7 (" '[E]quity' is defined as 'the

property with equity value—because it represents an estate in the land providing immediate and future benefit.[54] It thus fits the general definition of "property" at the time our Constitution was ratified.[55] If more proof were needed that "equity" is routinely considered the relevant property right in the nondebt value of a house, one need look no further than divorce proceedings, in which home equity is part of the property split between the parties.[56]

Perhaps for these reasons, numerous courts, parties, and commentators who have addressed similar cases in the tax-foreclosure context discuss the right to a surplus as related to the homeowner's equity—and none that I have found (nor any the majority cites) holds that the right to surplus proceeds is a freestanding property interest independent of the underlying equity interest.[57] The right to equity is, in fact, the very right that plaintiffs

---

value of a property * * * above the total of the liens.' "). Of course, there might be other liens on the property such that a landowner's equity is less than the property value minus what was owed in taxes. It is also true that equity may fluctuate as market values change. But I see no reason why a fluctuation in equity would affect whether the right is vested. Though a property owner is not guaranteed that real property will sell for a particular amount, the owner's interest still comes from his title and is more than a "mere expectation." *In re Certified Question*, 447 Mich at 788.

[54] See *In re Certified Question*, 447 Mich at 788 ("To constitute a vested right, the interest must be something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property . . . .") (quotation marks and citation omitted).

[55] See note 15 of this opinion.

[56] See, e.g., *Rogner v Rogner*, 179 Mich App 326; 445 NW2d 232 (1989) (reviewing an award of equity in the marital home).

[57] See *Dorce v City of New York*, ___ F Supp 3d ___ (SD NY, 2020) (Docket No. 19-cv-2216) (discussing the plaintiffs' loss of "equity" in their properties in the context of a

takings challenge); *Polonsky v Bedford*, ___ NH ___; ___ A3d ___ (2020) (Docket No. 2019-0339); slip op at 2, 5 (referring to the excess "equity" owed to the taxpayer and holding that when a tax deed is issued, a taking occurs "requiring that [the government] provide just compensation to the former owner when, as here, the equity in the property exceeds the amount owed"); *Automatic Art, LLC v Maricopa Co*, unpublished opinion of the United States District Court for the District of Arizona, issued March 18, 2010 (Case No. CV 08-1484-PHX-SRB), pp 2, 3, 6 (discussing the statutes and constitutional challenges to them as affecting the property owner's equity in the real property); *Thomas Tool Servs, Inc v Croydon*, 145 NH 218, 220; 761 A2d 439 (2000) ("Assuming that the property is worth substantially more than the $370.26 that the defendant paid for it, the defendant has realized an enormous surplus."); *Syntax, Inc v Hall*, 899 SW2d 189, 190 n 1 (Tex, 1995) ("The claim for excess proceeds concedes the loss of ownership and simply seeks a return of the excess value that was received at the sale."); *First NH Bank v Windham*, 138 NH 319, 327; 639 A2d 1089 (1994) (holding that the state constitution required notice of the tax deeding because, in part, the "tax deeding irreversibly deprives the owner of any equity in the property," given that no surplus proceeds were then available); *Anchorage v Thomas*, 624 P2d 271, 273 (Alas, 1981) (finding a statutory right to surplus proceeds and noting "the basic injustice inherent in requiring delinquent taxpayers to forfeit the total value of their property far in excess of taxes due"); *Auburn v Mandarelli*, 320 A2d 22, 32 (Me, 1974) ("In the absence of contrary provision by statute or constitution, a municipality's title to property acquired under the tax-lien-mortgage-foreclosure statute is absolute, and the city or town has no power to part with, nor duty to account for, any surplus value on any" equitable theory.); *Bogie v Barnet*, 129 Vt 46, 48, 54; 270 A2d 898 (1970) (finding a taking of the property to the extent of the difference between the tax sale bid "and the demonstrated far greater value of the property" evidenced by a later sale); *Balthazar v Mari Ltd*, 301 F Supp 103, 106 (ND Ill, 1969) ("[T]he Illinois tax delinquency statutes allow all real estate owners to recover the surplus value of their land."), aff'd 396 US 114 (1969); Note, *Someone to Lien On: Privatization of Delinquent Property Tax Liens and Tax Sale Surplus in Massachusetts*, 61 BC L Rev 667, 670, 691-694 (2020) (noting that "[e]normously inequitable outcomes occur as a result [of Massachusetts's similar tax-foreclosure law] because property owners can lose all equity in their home" and describing caselaw as addressing whether the government must return "surplus equity" left after the foreclosure sale); Note, *State Theft in Real Property Tax Foreclosure Procedures*, 54 Real Prop Tr & Est L J 93, 105 (2019) (noting that a surplus-retention system like ours "destroys property owners' home equity and leaves them with nothing"); Bartell, *Tax Foreclosures as Fraudulent Transfers—Are Auctions Really Necessary?*, 93 Am Bankr L J 681, 706 (2019) (arguing that owners concerned about the price obtainable at a tax sale should preemptively "conduct a private sale that may generate enough proceeds to pay the taxes in full and provide the owner any extant equity"); Clifford, *Massachusetts Has a Problem: The Unconstitutionality of the Tax Deed*, 13 U

28

Mass L Rev 274, 286-287 (2018) (discussing caselaw that addresses the proceeds as "surplus equity") (citation and quotation marks omitted); Kelly, Jr, *Bringing Clarity to Title Clearing: Tax Foreclosure and Due Process in the Internet Age*, 77 U Cin L Rev 63, 72 (2008) ("The vast majority of jurisdictions rely on a combined sale and foreclosure process to make sure both that the taxes due are paid in full and that any *surplus value in the property* is made available to the stakeholders whose interests have been liquidated.") (emphasis added).

Courts and parties in Takings Clause challenges to Michigan's foreclosure system have focused on the homeowner's deprivation of equity. See *Rafaeli, LLC v Wayne Co*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued June 4, 2015 (Case No. 14-13958), p 8 ("Plaintiffs also claim that the excess equity in their property was taken without just compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution."); Petition for Writ of Certiorari at 14, *Wayside Church v Van Buren Co*, 138 S Ct 380 (2017) (No. 17-88) ("The property interest at issue here is privately generated and owned equity."); cf. *Freed v Thomas*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued November 7, 2018 (Case No. 17-CV-13519), p 2 ("The heart of plaintiff's complaint is that this statutory scheme is unconstitutional because it provides no mechanism for the return to the delinquent taxpayer of the 'surplus equity' (i.e., the difference between the equity and the tax bill) or, in the event that the property is sold for less than fair market value, for the return to the delinquent taxpayer of the difference between the sale proceeds and the tax bill.").

A few cases addressing whether a statute provides for surplus to the homeowner do not mention "equity," but these cases are not deciding whether a nonstatutory basis exists for the property right in surplus proceeds; thus, they do not contradict the regnant interpretation of "surplus" as stemming from equity. See, e.g., *Lake Co Auditor v Burks*, 802 NE2d 896 (Ind, 2004) (finding statutory avenues for recovering surplus); *Kelly v Boston*, 348 Mass 385; 204 NE2d 123 (1965) (finding no statutory right to surplus). In addition, a handful of opinions rejecting constitutional challenges to tax-foreclosure statutes like the one here have not mentioned "equity," but they did not examine in any detail the potential sources of the property right at issue. See *Miner v Clinton Co*, 541 F3d 464, 474-475 (CA 2, 2008) (rejecting a due-process claim because the notices were adequate and an equal-protection claim because no discrimination occurred); *Reinmiller v Marion Co*, unpublished opinion of the United States District Court for the District of Oregon, issued October 16, 2006 (Case No. CV 05-1926-PK) (rejecting a takings claim and stating that Oregon law did not provide any property right entitling the homeowner to the proceeds, but only discussing the relevant tax-foreclosure statutes rather than common law). In a few cases with more detailed constitutional analyses, surplus or excess proceeds

rely on here to support their claim under the Takings Clause.[58] One federal district court

provided an insightful discussion on the topic, first summing up the United States Supreme

Court's caselaw—the same cases the majority here discusses—as "mak[ing] clear that a

Takings Clause violation regarding the retention of *equity* will not arise when a tax-sale

statute provides an avenue for recovery of the surplus equity."[59] The question in that case

was, as here, "[w]hat if the tax-sale statute does not provide a right to the surplus" or an

---

are mentioned without regard to the homeowner's equity; nonetheless, the cases do not hold that these proceeds are property without regard to equity. See *Sheehan v Suffolk Co*, 67 NY2d 52, 59, 60; 490 NE2d 523 (1986) ("There is no constitutional prohibition against such a full forfeiture" of the "surplus."); *Ritter v Ross*, 207 Wis 2d 476, 484; 558 NW2d 909 (App, 1996) ("We thus consider whether the Ritters had a property interest in the excess proceeds of the foreclosure sale . . . ."); *Oosterwyk v Milwaukee Co*, 31 Wis 2d 513, 517; 143 NW2d 497 (1966) (rejecting an unjust-enrichment claim for surplus proceeds).

[58] Plaintiffs' brief states, "The private property interest at issue in this case is privately generated and owned equity." Plaintiffs' Brief on Appeal (February 13, 2019) at 11. The majority dismisses this argument, saying that plaintiffs "conflate equity with surplus proceeds, suggesting that they are one in the same." Further, the majority criticizes my analysis as stating both that the equity of redemption represents an owner's equity and also acknowledging that the two are distinct. I see nothing inconsistent with noting the fact that, on one hand, the "equity of redemption" came to represent the homeowner's interest in the property, i.e., the equity, but, on the other hand, that there were and are certain distinctions between the two concepts, such as alienability, see note 50 of this opinion.

The majority goes on to say that it is unnecessary to discuss whether a property right to equity exists here because the question is whether the former property owner may collect surplus proceeds. However, it is necessary to begin the analysis with a vested right in the equity because, as explained above, there is no such thing as a vested right in surplus proceeds independent of the right to equity. Additionally, for the reasons we discuss below, even taken on its own terms, the right to surplus proceeds set forth in the majority's opinion is evanescent given that it can be so easily taken away.

[59] *Coleman*, 70 F Supp 3d at 80 (emphasis added).

30

"avenue for recover[ing]" it?[60]  The court continued, "A property interest in equity could conceivably be created by some other legal source," including caselaw—although not the Takings Clause itself.[61]  Throughout the opinion, the property right was characterized as "surplus equity."[62]

In short, the relevant property right in this case is the taxpayers' equity interest, not some contingent right to proceeds if there is a foreclosure sale.  Equity has better historical grounding than any novel and freestanding right to proceeds—indeed, it is the reason entitlement to proceeds may exist—and is a common enough concept that I cannot comprehend the majority's efforts to avoid it.

## C.  CONSEQUENCES

My difference of opinion with the majority on this point is no small matter.  Characterizing the property right at issue as equity has very real consequences here.  For one thing, the GPTA does not clearly abrogate any of a person's property rights in their real estate or in their equity generally.  Instead, the GPTA simply allocates the surplus proceeds after the tax-foreclosure sale.  Accordingly, it cannot be said to have abrogated the common-law right to equity.[63]

---

[60] *Id.*

[61] *Id.* at 80-81.

[62] See, e.g., *id.*

[63] Defendants have not raised the argument that the Legislature abrogated the common-law right to equity.  See *Mich Gun Owners, Inc v Ann Arbor Pub Sch*, 502 Mich 695, 709-710; 918 NW2d 756 (2018) (noting that parties raise the arguments in our adversary system).  Under the regnant interpretive principle noted above, " 'legislative amendment of the

31

In addition, the statute contemplates—and indeed, expressly provides for—a number of scenarios in which there will be no surplus proceeds. For our purposes, the first key point in the process occurs when the court enters the foreclosure judgment. This must occur before March 30, and the judgment must become effective on March 31.[64] When it becomes effective, the taxpayer loses his or her redemption rights and absolute title vests in the government.[65] The following day, April 1, the foreclosing governmental unit obtains the right to possession.[66]

Afterward, the state has until the first Tuesday in July to buy the property from the foreclosing governmental unit for the greater of either the minimum bid—which equals the

---

common law is not lightly presumed,' " and the "Legislature 'should speak in no uncertain terms' when it exercises its authority to modify the common law." *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20, 28; 780 NW2d 272 (2010) (citation omitted). Like the majority's view that the Legislature cannot abrogate common-law property rights extant before 1963, this principle raises separation-of-powers concerns as well. See *A Matter of Interpretation*, pp 27-28. But it is longstanding, and no party has challenged it here. Under this canon, it is reasonably apparent that the Legislature left untouched the taxpayer's common-law right to equity. Nothing in the statute clearly displaces that right. The same could not be said, however, for the majority's separate right to surplus proceeds, which the Legislature very clearly attempted to extinguish in the GPTA. In any event, the parties' failure to address this argument means that it should not be resolved in this case.

[64] MCL 211.78k(5). These dates are for uncontested cases. The judgment in contested cases becomes effective 10 days after the hearing, and 21 days after entry of the judgment the taxpayer loses his or her redemption rights and absolute title vests in the government. MCL 211.78k(5) and(6). In contested cases, the government obtains the right to possession 22 days after judgment enters. MCL 211.78g(1).

[65] MCL 211.78k(5) and(6).

[66] MCL 211.78g(1).

debt and various additional costs[67]—or the "fair market value."[68]   This protects the foreclosing unit, which would be certain to recoup the debt and costs if the state exercises its right to purchase.  And under this option the property might sell for a price reflecting the debt and the equity.  But if the state declines, the next series of options ensures that no surplus will occur.  Next, the "city, village, or township" where the property is located can purchase the property "for a public purpose" at the minimum bid, meaning that no surplus would result.[69]  If they pass on the purchase, then the county has the chance to buy it (without being required to have a "public purpose" for doing so), again for the minimum bid.[70]  If any of these last few governmental units—city, village, township, or county—buys the property and subsequently sells it, any excess proceeds (less additional costs) are distributed in various funds.[71]

If the property goes unpurchased after all this, the foreclosing unit holds one or more auctions from July to November.[72]  Although the statute prescribes notice requirements, it allows the foreclosing unit to "adopt procedures governing the conduct of the sale . . . ."[73]

---

[67] MCL 211.78m(16)(a).

[68] MCL 211.78m(1).

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] MCL 211.78m(2).

[73] *Id.*

To sell the property, the foreclosing unit must receive at least the "minimum bid."[74]  If the property goes unpurchased after an auction, the city, village, township, or county can buy it for the minimum bid without needing a public purpose to do so.[75]  At the final auction, there is no minimum bid.[76]  Property that is not purchased is transferred to the city, village, or township where it is located unless the unit objects, in which case the property goes to the foreclosing unit.[77]

In light of this statutory framework, the majority's focus on the surplus proceeds as the relevant property, and thus the postsale retention as the taking, produces puzzling results.  Because "a property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it,"[78] under the majority's theory, no constitutional issues occur until the surplus proceeds are retained.  It does not matter that once title has vested in the government without chance of redemption, the taxpayer's property—his or her equity—has been taken.  Consequently, the majority's view of the case would seemingly be that if the property does not sell at auction and is simply transferred to a governmental unit, the taxpayer is out of luck: no proceeds, let alone

---

[74] *Id.*

[75] MCL 211.78m(3).

[76] MCL 211.78m(5).

[77] MCL 211.78m(6) and(7).

[78] *Knick v Scott Twp*, 588 US ___, ___; 139 S Ct 2162, 2170; 204 L Ed 2d 558 (2019).

a surplus, have been produced or retained by the government.[79]  Perhaps worse still, governmental units have numerous opportunities to purchase the property for the minimum bid, i.e., for the debt (and costs), and thus obtain it for an amount that will usually be much less than fair market value.  Yet in those cases, too, because no surplus would result, the majority leaves the taxpayer without a remedy.

The better view, under the law described above, is that the property taken is the taxpayer's equity and that this occurs when title vests in the government with no opportunity for redemption.  In that circumstance, if the government retains the property, the taxpayer would be able to seek compensation for the deprivation of his or her equity.[80] If the property is sold, any surplus represents the remaining equity in the property and is owed as the just compensation due the taxpayer.[81]  Returning the surplus would usually satisfy the Takings Clause by "leav[ing the property owner] 'in as good as position as if his lands had not been taken,' "[82] i.e., by leaving the property owner with the representation of what was taken.

---

[79] Of course, the majority might counter that this is a question for another day because the properties here were sold.  But it is hard to imagine what the majority would do in such a case besides either denying the takings claim under the theory it adopts here or reconsidering whether it is based on the taxpayer's right to the equity in his or her property.

[80] See *Polonsky*, slip op at 5 (noting that the statutory scheme did not require the government to sell the foreclosed property but that, in those cases, the government has conflicts with the Takings Clause by failing to pay over the equity).

[81] See note 52 of this opinion and accompanying text.

[82] *Dep't of Transp v Tomkins*, 481 Mich 184, 198; 749 NW2d 716 (2008) (citation omitted).

To elaborate on this last point, awarding the surplus as "just compensation" only makes sense in light of the underlying principle that the surplus represents the owner's equity.[83]  It is, of course, possible that the surplus might not capture the value of a taxpayer's property.[84]  But the "just compensation" requirement does not require local governments to impoverish themselves.[85]  Thus, taxpayers seeking some speculative value beyond the surplus realized in the tax sale might often lack meritorious claims.  It is also worth noting, in this regard, that the taxpayers would be free to conduct a private sale of the property during the redemption period prior to title vesting in the government and, by failing to do so, might be considered to have agreed to the value produced by the tax-foreclosure sale.[86]

---

[83] See note 52 of this opinion.

[84] See *State Theft*, 54 Real Prop Tr & Est L J at 126 (noting that limiting the taxpayer to the surplus might cause him or her to lose some equity but arguing that this result might be consistent with the "just compensation" requirement).

[85] See *United States v Commodities Trading Corp*, 339 US 121, 123; 70 S Ct 547; 94 L Ed 707 (1950) ("Fair market value has normally been accepted as a just standard.  But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards. . . .  [T]he dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?") (citation omitted); *In re State Hwy Comm'r*, 249 Mich 530, 535; 229 NW 500 (1930) ("Just compensation should neither enrich the individual at the expense of the public nor the public at the expense of the individual.").

[86] See *Tax Foreclosures*, 93 Am Bankr L J at 706-707 (arguing that courts reviewing whether foreclosure laws protect the debtor's "equity" should consider that the debtor's "right of redemption provides to the owner of the property the opportunity to realize the full fair market value of the property" less the taxes owed, and the debtor's failure to avail

On the other hand, by limiting the compensation to the surplus (when one exists), the majority risks depriving taxpayers of "just compensation." As demonstrated above, the statute gives governmental units the option to ensure that there will be no surplus. Under the majority's regime, a rational governmental actor is incentivized to buy properties that have a market value above the minimum bid amount that must be paid or to take other steps to limit or eliminate surpluses. For example, both the Legislature in constructing the statutory framework and the foreclosing unit in prescribing sale procedures could design rules that diminish the probability of obtaining fair market value in the tax-foreclosure sale. Indeed, while it might be true that most sale prices now do not even cover the taxes owed, the foreclosing unit would have little incentive to conduct a sale that earns anything more than the delinquent tax sum.[87] Consequently, I would not now rule out the possibility that "just compensation" might require something greater than the surplus in a particular case, especially in cases in which the government purchased the property for the minimum bid.

But we have no reason to decide that issue in this case because, although plaintiffs nominally distinguish equity and surplus, they have offered no argument suggesting that the tax foreclosures here failed to obtain a fair price for their properties.

---

themselves of this relief constitutes agreement to the "price obtained by the state foreclosure process").

[87] The majority seems untroubled by the possibility that what it might have taken away with one hand—i.e., the Legislature's authority to prospectively abrogate the supposed common-law right to surplus proceeds—it has given with the other by defining the right so that the Legislature can shrink or erase those surplus proceeds.

## III. CONCLUSION

Although I agree with the majority as to the ultimate disposition of this case, I disagree with its reasoning. I would not define the constitutional term "property" by merely citing an example of what the ratifiers might have thought would fall within the meaning of that term. Instead, I would give the word its ordinary meaning at the time the Constitution was ratified and then apply that meaning to the case at hand. In addition, I would examine the relevant property right: the taxpayers' equity in the real property. Equity falls within the semantic scope of "property" under our Constitution. And the Legislature did not purport to abrogate the taxpayer's equity. Therefore, a taking occurred when title to plaintiffs' property was vested in the government without any possibility of redemption. In this case, I agree with the majority that plaintiffs are owed the surplus proceeds from the tax-foreclosure sales.

David F. Viviano